COMMONWEALTH *vs.* JOHN RAYMOND.

Hampden. January 6, 1997. - March 7, 1997.

Present: WILKINS, C.J., O'CONNOR, GREANEY, FRIED, & MARSHALL, JJ.

*Practice, Criminal,* Instructions to jury, Argument by prosecutor, Sentence, New trial, Capital case. *Homicide. Intoxication. Evidence,* Hearsay, Admissions and confessions, Voluntariness of statement. *Joint Enterprise. Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Felony-Murder Rule.*

No substantial likelihood of a miscarriage of justice was created by the judge's instructing first on the elements of murder in the second degree and then on the elements of murder in the first degree where, taking the instructions as a whole, there was no possibility that a reasonable juror could have misunderstood the instructions. [385-387]

At a first degree murder trial, no substantial likelihood of a miscarriage of justice was created by the judge's instruction to the jury that they could consider voluntary intoxication in considering whether the elements of premeditation and extreme atrocity or cruelty had been established. [387-388]

At a murder trial there was no substantial likelihood of a miscarriage of justice created by the jury's consideration of a certain hearsay statement which was of assistance to the defense in impeaching the witness and which was cumulative of other properly admitted evidence. [388-389]

At a murder trial there was no reversible error in the prosecutor's closing argument with respect to whether the victim was conscious during the time she was assaulted where the evidence was sufficient to justify the argument [389-390]; further, the prosecutor's statement to the jury, on the issue of extreme atrocity or cruelty, that they were the conscience of the community was entirely proper [391]; and finally, an ambiguous statement of the prosecutor, in the context of the argument as a whole, would not have misled the jury into believing the prosecutor was personally vouching for one witness's credibility and in any event, the judge's instructions on credibility of witnesses would have mitigated any prejudice to the defendant [391-392].

In a murder case there was no merit to the defendant's argument that the police should have informed him that he was a suspect and that the co-defendant had confessed before he could have made a valid waiver of his Miranda rights. [392-393]

The record of a hearing on a defendant's motion to suppress his statements to the police did not support the defendant's contention that he had invoked his right to remain silent during police questioning. [393-394]

Police officers' suggestion to a defendant that it would be in his best inter-

est to get out his side of the story to contradict the codefendant and that the defendant's mother might be charged as an accessory to his crimes did not amount to coercion such as would render the defendant's subsequent confession involuntary. [394-396]

Where a jury in a murder case returned a special verdict that the defendant was guilty of murder in the first degree on the theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder, with rape as the felony, and a verdict of guilty of rape, consecutive life sentences for rape and murder were not duplicative. [396-397]

A judge did not abuse his discretion to deny a criminal defendant's motion for a new trial based on an unsworn recantation of a codefendant that lacked any indicia of reliability. [397]

INDICTMENTS found and returned in the Superior Court Department on October 13, 1987.

A pretrial motion to suppress evidence was heard by *Elizabeth A. Porada*, J., the case was tried before *Lawrence B. Urbano*, J., and a motion for a new trial was heard by *Francis X. Spina*, J.

*Roderick B. O'Connor* for the defendant.

*Elizabeth Dunphy Farris*, Assistant District Attorney, for the Commonwealth.

FRIED, J. The defendant, John Raymond, was indicted for forcible rape of a child and murder in the first degree. The jury convicted him on both indictments, and the judge sentenced him to two consecutive life terms. He has appealed from his convictions and has made two motions for a new trial, the first of which was denied and the second of which has not yet been heard. We affirm the convictions and find no reason to grant a new trial or reduce the degree of murder under G. L. c. 278, § 33E. We remand to the Superior Court for consideration of those aspects of Raymond's second motion for a new trial, which have not yet been heard.

I

The body of the fifteen year old victim was discovered floating in the Connecticut River. Her arms were tied behind her back with socks, with another sock tied around her neck and another in her mouth as a gag. The medical examiner reported that her body showed no signs that a struggle had taken place, nor of bruises from strangulation or forced sex,

nor of semen.[1] He determined that the cause of death was drowning.

Raymond Stanislawski, after initially denying involvement in the victim's death, gave a statement to the police in which he implicated himself and the defendant in the murder of the victim. According to Stanislawski, the defendant and he were drinking and ingesting cocaine during the day of the murder. Raymond drove Stanislawski to the victim's apartment where they offered to drive her to a store. Instead, the three drove to Jones Point Park in Holyoke where Raymond and Stanislawski continued to drink. They walked to an isolated area known as "High Rock" near the Connecticut River. Raymond suggested that they rape the victim which they both proceeded to do. Then, Raymond, fearful that she would tell the police, decided that they should kill her. They then tied her up with socks and Raymond choked her with a sock tied around her neck. While "[s]he was still kicking a little," Raymond stopped choking her, and they threw her body into the river.

After hearing Stanislawski's statement, the police asked Raymond to go voluntarily to the station house for questioning, which he agreed to do. At the station house, Raymond received Miranda warnings, and signed a waiver form. The police brought in Stanislawski. The police read his statement to Raymond, and then Stanislawski said to him: "[T]here's no use lying [Raymond], it's all over." Raymond showed signs of upset, but denied having committed the murder. The police told him that his mother lied to the police on his behalf and that she might therefore be implicated as an accessory after the fact. The officers continued to accuse Raymond as he alternatively denied the charges by shaking his head and lapsing into silence. The officers told Raymond that he should not allow Stanislawski's story, which placed most of the blame on Raymond, to stand as the only account. After approximately twenty minutes of this questioning, Raymond decided to make a statement. Raymond's statement was similar to Stanislawski's in most respects but Raymond indicated that he was so physically impaired by drugs and alcohol that he was unable to rape the victim, and he stated

---

[1] The body was badly decomposed so that some of this evidence could have been lost.

that the rape and murder were both Stanislawski's idea and that Stanislawski had been the one to choke the victim.

Raymond was the first to be brought to trial. Stanislawski testified for the Commonwealth. The Commonwealth introduced Stanislawski's statement to police as well as Raymond's. In addition, the Commonwealth introduced witnesses who had seen Raymond and Stanislawski with the victim on the night she was killed. The defendant maintained an alibi defense with several members of his family vouching for his whereabouts on the night of the murder. He argued that the confession was coerced, fabricated by the police, and that he had signed it without reading it because he was afraid of the police and wanted to protect his mother. Raymond was found guilty, and Stanislawski later accepted a plea bargain in which he confessed to murder in the second degree.

After being sentenced to two consecutive life sentences, Raymond filed a motion for a new trial complaining about the judge's instructions on intoxication and the admission of Stanislawski's written statement, and presenting evidence that Stanislawski had recanted his testimony. Stanislawski refused to testify at the hearing on the motion, invoking his privilege under the Fifth Amendment to the United States Constitution. The judge denied the motion in all respects.

Raymond recently filed a second motion for a new trial based on a letter written to Raymond's sister which he claims implies that, contrary to Stanislawski's claims and the Commonwealth's position at trial, Stanislawski's testimony was elicited through an offer of a lesser sentence by the Commonwealth. This second motion has not yet been heard by a motion judge. The relevant part of the letter states:

> "I thought you knew I was doing a second degree life sentence. Yes I knew I was gonna [*sic*] get that when I testified."

## II

### A

Raymond challenges the judge's instructions to the jury on two grounds: that they were confusing and in violation of *Commonwealth* v. *Sama*, 411 Mass. 293 (1991), and that the judge improperly charged the jury on intoxication. The judge

began by defining murder in the second degree and describing the three prongs of malice, one of which must be met for the jury to find murder. He then moved on to define murder in the first degree where he described each of the three theories of first degree murder: premeditation, extreme cruelty or atrocity, and felony-murder. He stated that the jury must find an unlawful killing done with malice and then the jury must additionally find premeditation, extreme atrocity or cruelty, or felony-murder in order to constitute murder in the first degree. The judge discussed voluntary intoxication in his instructions on premeditation and extreme atrocity or cruelty.

Raymond first claims that the judge's instructions were erroneous under our decision in *Commonwealth* v. *Sama, supra.* In that case, "[t]he judge repeatedly instructed the jury to consider first whether the defendant was guilty of murder in the second degree under one or more of the three alternative forms of malice, and then decide whether the evidence supported an additional finding of deliberate premeditation or extreme atrocity or cruelty, which would increase the verdict from second to first degree murder." *Id.* at 299. We concluded that this approach "did nothing more than invite confusion and error" because "[m]urder in the first degree and murder in the second degree cannot coexist." *Id.* at 299-300. We went on to say that it would be better if "[a] jury should be instructed first to decide whether the defendant is guilty of murder and, if so, then to decide whether the defendant is guilty of murder in the first degree. If so, the jury should say so by their verdict. If not, they should find the defendant guilty of murder in the second degree . . . ." *Id.* at 300.

Raymond did not object to the instructions at trial so we consider them under the substantial likelihood of a miscarriage of justice standard. G. L. c. 278, § 33E. We look to the charge as a whole to determine whether it fairly instructs the jury. *Commonwealth* v. *Blanchette,* 409 Mass. 99, 105 (1991). We base our judgment on what a "reasonable juror could have interpreted the instruction" to mean. *Commonwealth* v. *Nieves,* 394 Mass. 355, 360 (1985). Although the instructions did not commit the error we identified in *Sama,* we agree with the defendant that the instructions did not conform to our suggestion in *Sama* because the judge instructed on mur-

der in the second degree first.[2] The instructions, however, were correct as to each of the elements that must be satisfied for murder in the first degree. Furthermore, even though the judge instructed the jury on murder in the second degree first, he did not direct the jury to make a decision on second degree murder before considering murder in the first degree, which was the critical error in *Sama.* Therefore, while we adhere to our suggestion in *Sama,* we see no possibility that a reasonable juror could have misunderstood the instructions simply because the judge reversed the correct order of instruction on murder in the first degree and murder in the second degree.

The defendant also contends that the instructions on intoxication were in error because the judge did not specifically inform the jury that voluntary intoxication could be considered to reduce the verdict from murder in the first degree to murder in the second degree.[3] The defendant did not object to the instructions on intoxication at trial. While the judge did not state explicitly that voluntary intoxication could be the basis of reducing the degree of murder, he correctly instructed the jurors that they could consider voluntary intoxication on the premeditation and extreme atrocity or cruelty theories of murder in the first degree. We have never required more than a simple instruction that the jury may consider voluntary intoxication when considering state of mind. See *Commonwealth* v. *Sires,* 413 Mass. 292, 299-301 (1992); *Commonwealth* v. *Morgan,* 422 Mass. 373, 376-378 (1996). We do not think that an explicit statement that intoxication could be the basis for reducing the degree of murder from first to second degree becomes more important because the judge described murder in the second degree before murder in the first degree. We therefore believe that a

[2]The trial in this case occurred forty-two months before the *Sama* decision. While this is not dispositive, it is important to note that the judge did not have the guidance of *Sama* in giving these instructions.

[3]The defendant's trial strategy was not to claim intoxication but rather to deny being at the scene at all. He denied using drugs and alcohol on the day in question. The judge considered not even giving instructions on intoxication: "This alcohol thing is kind of hard to handle, because there's utterly no evidence in the case that he was under the influence of alcohol." The judge gave the instruction only after defense counsel argued that "the jury at least should be made aware that it's within the realm of their consideration."

judge's explanation that the jury may consider intoxication in evaluating whether an essential element of murder in the first degree has been established is equivalent to an instruction that intoxication may be considered in reducing the verdict from murder in the first degree to murder in the second degree, and satisfies our requirements for instructions on voluntary intoxication.[4]

## B

After Stanislawski's direct testimony, the prosecutor introduced Stanislawski's statement to the police incriminating Raymond. Had Raymond made an objection at trial, Stanislawski's statement might have been excluded as a prior consistent statement.[5] See *Walsh* v. *Wyman Lynch Co.*, 244 Mass. 407, 409 (1923). Having failed to object, however, "[t]he defendant cannot now require that it be disregarded. Hearsay, once admitted, may be weighed with the other evidence, and given any evidentiary value which it may possess." *Commonwealth* v. *Keevan*, 400 Mass. 557, 562 (1987), quoting *Mahoney* v. *Harley Private Hosp., Inc.*, 279 Mass. 96, 100 (1932). Because this is an appeal from a conviction of murder in the first degree, however, we must consider whether the jury's consideration of the hearsay created a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. Cf. *Keevan, supra* at 562. We conclude that it did not.[6] The jury heard the confession Raymond made at the station house and heard the testimony of Stanislawski. Raymond attempted to retract his statement at trial, indicating that he had been

---

[4]The judge also did not instruct the jury that intoxication could be considered in determining whether the killing was done with malice. Where the jury were instructed on intoxication under deliberate premeditation and where the jury found premeditation, the failure to instruct the jury they could consider intoxication in deciding malice is not prejudicial. *Commonwealth* v. *Wallace*, 417 Mass. 126, 134 (1994).

[5]Raymond did object based on authenticity, but that objection is insufficient to preserve a hearsay objection. See *Commonwealth* v. *Cancel*, 394 Mass. 567 (1985).

[6]The Commonwealth's argument that the statement was essentially the same as Stanislawski's trial testimony and therefore was only cumulative evidence is not conclusive. The statement was introduced precisely because it does mirror Stanislawski's trial testimony, and therefore might have a tendency to reinforce and corroborate Stanislawski's trial testimony. Therefore, the statement could have a prejudicial effect even though it contained no new information implicating Raymond.

afraid of the police officers when he made his statement. In explaining why he gave the allegedly false confession to the police, he explained that the police read a statement from Stanislawski to him which stimulated his signing of a similar confession. Thus, the existence of this earlier statement was an integral part of Raymond's own story. In addition, even if the statement had not been initially introduced, the defense might well have introduced the statement itself on cross-examination of Stanislawski. The statement was different in some respects from Stanislawski's trial testimony — most importantly in the earlier statement he denied raping the victim. At trial defense counsel did indeed try to impeach Stanislawski's credibility based on these inconsistencies. Because the evidence against Raymond was overwhelming, because the statement assisted the defense, and because the statement contained no new information damaging to Raymond, there is no substantial likelihood of a miscarriage of justice.[7] Furthermore, it is significant that the jury did not need to choose between the testimony of Stanislawski and the defendant's statement to have found an adequate basis for murder in the first degree. Because the jury were instructed on joint venture, Raymond could have been found guilty whether he or Stanislawski did the actual killing and raping.

C

Raymond asserts several irregularities in the prosecutor's closing argument to the jury. First, Raymond claims that portions of the prosecutor's closing argument quoted below were inflammatory and raised facts not in evidence:

> "Sit here and think about what happened to [the victim]. Think about her state of mind as she was being raped by Stanislawski and Raymond, made a decision at that time that she was helpless and decided she wasn't going to fight. . . .
>
> "She was helpless. She couldn't move. Then, what did they do? Imagine, ladies and gentlemen, what was going through [the victim's] mind in the dark up at High Rock."

[7]It is important to note that Raymond had a full opportunity to confront and cross-examine Stanislawski at trial.

Raymond maintains that the evidence did not support the suggestion that the victim was conscious when thrown into the water. Some of the testimony regarding the strangulation, and their belief that she was dead or unconscious when they threw her in the water, suggests she may have been unconscious. There was substantial contrary evidence as well. The medical examiner testified that the victim was alive when she hit the water, but he did not know if she was conscious. Stanislawski testified she was still kicking, and the absence of bruising from the strangulation suggests that she might not have been strangled enough to cause unconsciousness. " 'In closing argument, counsel may argue the evidence and the fair inferences which can be drawn from the evidence.' . . . 'Counsel may also attempt to assist the jury in their task of analyzing, evaluating, and applying evidence. Such assistance includes suggestions by counsel as to what conclusions the jury should draw from the evidence' " (citations omitted). *Commonwealth* v. *Lamrini*, 392 Mass. 427, 431 (1984). The evidence that the victim was conscious was sufficient to justify the prosecutor's argument. *Id.* Contrast *Commonwealth* v. *Smith*, 387 Mass. 900, 910 (1983) (prosecutor suggesting "the victim felt 'the flame come at him' " was improper where the medical examiner concluded the victim was already dead before his body was burned). In this case, it was highly relevant to the issue of extreme atrocity or cruelty whether the victim was conscious when she was thrown in the water, *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), and the evidence could reasonably be construed to suggest that the victim was alive and conscious as Raymond and Stanislawski planned and executed her murder. In such circumstances, we perceive no error. Finally, the judge's instructions, reprinted in the margin,[8] would have helped cure any misunderstanding. *Commonwealth* v. *Ferreira*, 381 Mass. 306, 316 (1980).

---

[8]The judge stated:

> "Well, you are the impartial evaluators. You are to put yourself not in the position of anyone in the case but you are to determine the facts in evidence, as I said, as impartial evaluators of the evidence that's been presented to you. Now that, those remarks concerning placing yourself in the victim's position, were directed, it would appear, to the question of cruelty and atrocity. But, keep in mind you are exactly what I said. You are independent evaluators of the evi-

Raymond further complains that the prosecutor repeatedly told the jury that they were the "conscience of the community," and that this argument was improper, citing the Appeals Court's decision in *Commonwealth* v. *Mathews*, 31 Mass. App. Ct. 564, 573 (1978) (jurors, in a rape case, "bear no such burden; their role in a trial is limited to finding the facts on the basis of the evidence, dispassionately and impartially"). Where the extreme atrocity or cruelty theory of murder in the first degree is in issue, however, we have held that such an argument is "entirely proper. The jury represented the community's conscience in assessing whether the killing had occurred with extreme atrocity or cruelty." *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 547 (1993).

Raymond claims that the prosecutor improperly vouched for Stanislawski's credibility. In advocating that the jury should believe Stanislawski, the prosecutor explained that Stanislawski did not allege police intimidation and that, although he lied initially to cover up the murder, he eventually decided to tell the truth. The prosecutor then stated, "He told you the truth when he testified." Although Raymond's trial counsel did not object, Raymond argues that this statement violates our rule against the prosecutor's vouching for the credibility of a witness. *Commonwealth* v. *Thomas*, 401 Mass. 109, 115-116 (1987). The statement questioned by Raymond was the culmination of an argument made by the prosecutor that Stanislawski was a credible witness who should be believed. "Where credibility is at issue, it is certainly proper for counsel to argue from the evidence why a witness should be believed." *Id.* at 116. We think in the context in which the statement was made that the jury would likely have understood this statement not as an assertion of the prosecutor's personal belief, but rather as a statement of the logical conclusion of the prosecutor's argument. We acknowledge that the statement is ambiguous, and we discourage the use of such an ambiguous statement in the course of closing arguments. However, "[m]ere[] unfortunate and unartful isolated instances" are generally not enough to lead the

dence as presented to you and you look at the evidence from no one's point of view except that as an impartial arbitrator."

jury to improper inferences drawn from presumed personal knowledge of the prosecutor. *Id.* at 115. The absence of objection from defense counsel further convinces us that, taken in the context, the remark would not likely have misled the jury or prejudiced Raymond. See *Commonwealth* v. *Toro,* 395 Mass. 354, 360 (1985); *Commonwealth* v. *Kozec,* 399 Mass. 514, 518 n.8 (1987). In addition, we recognize that clarifying jury instructions may mitigate any prejudice inherent in closing statements. See *Commonwealth* v. *Kozec, supra* at 518. While the judge did not specifically point out the ambiguity of the statement and correct it, he did emphatically state to the jury:

> "So, if you . . . take into account the appearance of the witness, the conduct of the witness on the stand, the manner in which a witness testified or any relationship to the parties or the outcome and the interest in the outcome and the inconsistencies in the testimony, you take all those factors into account and any others that you deem relevant and then you determine the weight and credibility you give to a particular witness's testimony."

We believe this unambiguous charge to the jury that they must determine credibility on their own mitigated any prejudice that might be derived from the prosecutor's statement.

### III

The gravamen of the next set of Raymond's claims is that his statement to the police was not voluntarily obtained and therefore should be suppressed. His first contention is that the police gave him the warnings required by *Miranda* v. *Arizona,* 384 U.S. 436 (1966), too early, depriving him of an opportunity to make a knowing and intelligent waiver of the rights those warnings explain. He claims that, because the police did not inform him that he was a central suspect or that Stanislawski had confessed before he received the warnings, he had no way of understanding the implications of the waiver, citing the United States Supreme Court's decision in *Moran* v. *Burbine,* 475 U.S. 412, 421 (1986), which requires that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the con-

sequences of the decision to abandon it." Even in that deci-
sion, the Supreme Court rejected the expansive reading of
Miranda which Raymond proposes: "No doubt the additional
information would have been useful to respondent; perhaps
even it might have affected his decision to confess. But we
have never read the Constitution to require that the police
supply a suspect with a flow of information to help him
calibrate his self-interest in deciding whether to speak or
stand by his rights." *Id.* at 422 (holding that police need not
inform defendant who waived his Miranda rights that his at-
torney had called). In *Colorado* v. *Spring,* 479 U.S. 564, 576
(1987), the Supreme Court stated that it had "never held that
mere silence by law enforcement officials as to the subject
matter of an interrogation is 'trickery' sufficient to invalidate
a suspect's waiver of Miranda rights, and we expressly decline
so to hold today." The Court concluded that the defendant
must understand the warnings themselves and must not be
tricked or coerced into abandoning those rights. However,
once the warnings are read, the defendant presumably
understands that he need not answer any questions the police
pose. Neither the subject matter of the questioning nor the
defendant's status as a suspect has any bearing on whether
the defendant understands that he need not answer the ques-
tions. *Id.* at 567-577. Our cases do not require that a defen-
dant must have information regarding the crime about which
he will be questioned or about police suspicions before mak-
ing a valid waiver of his Miranda rights. *Commonwealth* v.
*Amazeen,* 375 Mass. 73, 78 (1978) (no "additional require-
ment that police officers must advise a defendant that he is
charged with a crime or that he is a suspect before a valid
waiver may be obtained"). See *Commonwealth* v. *Medeiros,*
395 Mass. 336, 345 (1985) (new warnings not required when
police decide to question defendant about an unrelated crime);
*Commonwealth* v. *Hooks,* 38 Mass. App. Ct. 301, 305 (1995).[9]

Raymond next argues that, even if the initial waiver of his

---

[9]Raymond cites decisions which discuss when the defendant is in custody
and undergoing interrogation that Miranda warnings are required. *Com-
monwealth* v. *Haas,* 373 Mass. 545 (1977), *S.C.,* 398 Mass. 806 (1986).
*United States* v. *Britton,* 68 F.3d 262 (8th Cir. 1995), cert. denied, 517 U.S.
1105 (1996). His argument is that Miranda warnings are not required until
there is both custody and interrogation. He then argues that, because Ray-
mond did not realize he was in custody, Miranda warnings were too early.
This argument and the cases cited are inapposite. Those cases define

Miranda rights were valid, he invoked his right to remain silent before his confession. Once the suspect has invoked his right to remain silent, the police may not continue the interrogation or make repeated efforts to wear down the suspect in an attempt to make him change his mind. *Miranda* v. *Arizona, supra* at 473-474 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease"). In this case, Raymond initially denied his involvement and then crossed his arms and was silent, shaking his head in response to the officers' questioning. These responses did not invoke Raymond's right to remain silent, thus obligating the officers to cease their questioning. In this context, the silence and the shaking of the head do not suggest a desire not to respond and to halt the questioning. Rather, the implication of the head shaking is that Raymond wanted to deny the allegations. The fact that he did not respond orally could be attributed to nervousness or a desire to think through his answer before he spoke. This response is not sufficient to invoke the right to remain silent. See *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 265 (1982) (where defendant cried and said, "I don't want to talk" in such a muffled way the officers did not understand it did not invoke the right to remain silent). Contrast *Commonwealth* v. *Brant,* 380 Mass. 876, 880, cert. denied, 449 U.S. 1004 (1980) (response of "no" to question whether defendant was willing to continue without a lawyer invoked right to silence). In *Commonwealth* v. *Roberts,* 407 Mass. 731, 733 (1990), the defendant refused to answer some questions but responded to subsequent questions. We held that by this conduct the defendant showed an understanding of his rights, not a desire to stop the questioning. Similarly, Raymond's continuing responses to the officers indicated that he wanted the process to continue while he denied the allegations and decided whether or not to confess.

The defendant also maintains that the statement was not made voluntarily and that its admission in evidence violates both the Fifth Amendment to the United States Constitution and art. 12 of our Declaration of Rights. Raymond claims

the point at which Miranda warnings must be given. They do not suggest that Miranda warnings cannot be given earlier. We think that it is good practice, in fact, for the police not to wait until the exact moment when the warnings are constitutionally required.

two improper techniques which caused his confession to be coerced: First, the officer suggested it would be in his best interests to get out his side of the story to contradict Stanislawski. Raymond argues that this advice was misleading because it suggested that he should admit to felony-murder which could not have been in his best interests. Second, Raymond argues that the officer's suggestion that his mother might be charged as an accessory after the fact for lying about the whereabouts of her car[10] was coercive.

In reviewing whether a statement was made voluntarily, we accept the judge's subsidiary findings of fact unless not warranted by the evidence. *Commonwealth* v. *Tavares*, 385 Mass. 140, 144-145, cert. denied, 457 U.S. 1137 (1982). The judge's ultimate findings, while open for review, are afforded "substantial deference." *Id.* at 145, quoting *Commonwealth* v. *White*, 374 Mass. 132, 138 (1977), aff'd by an equally divided Court, 439 U.S. 280 (1978). The test for voluntariness of a confession is "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995).[11] Misinformation by the police does not necessarily render a confession involuntary. *Id.* at 664. See *Commonwealth* v. *Meehan*, 377 Mass. 552, 563 (1979), cert. dismissed, 445 U.S. 39 (1980). We have recognized, however, that police officers may not give an "assurance, express or implied, that [confessing] will aid the defense or result in a lesser sentence." *Meehan, supra* at 564. We believe that the officer suggesting that the defendant should tell "his side of the story" fell short of the assurance prohibited in *Meehan* and was more closely related to

[10]Raymond's mother owned the car which Raymond and Stanislawski used to pick up the victim.

[11]The defendant asks us to adopt the standard enunciated in *Bram* v. *United States*, 168 U.S. 532, 542-543 (1897), which states that a confession must not be "obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . ." The Court of Appeals for the First Circuit has recognized that *Bram*, while never explicitly overruled, has been "modified." *United States* v. *Jackson*, 918 F.2d 236, 241-242 (1st Cir. 1990). We agree that "under current precedent [*Bram*] does not state the standard for determining the voluntariness of a confession," *Arizona* v. *Fulminante*, 499 U.S. 279, 285 (1991), under the Fifth Amendment or under art. 12. We do not find in art. 12 a requirement that we adopt the *Bram* standard.

·"suggest[ing] broadly that it would be 'better' for a suspect to tell the truth," which we have expressly allowed police officers to do. *Id.* As to the possibility of charging Raymond's mother as an accessory, we agree with the Appeals Court that "a motive to protect his mother is not sufficient to find his confession involuntary." *Commonwealth* v. *Berg*, 37 Mass. App. Ct. 200, 206, (1994). While the police may not expressly bargain with the defendant over the release of other individuals or make threats of arresting and charging others with no basis, *id.*, where this type of conduct is absent, the police may bring to the defendant's attention the possibility that his relatives may be culpable. *Id.* Cf. *United States* v. *Jackson*, 918 F.2d 236, 242 (1st Cir. 1990); *Allen* v. *McCotter*, 804 F.2d 1362 (5th Cir. 1986). This defendant, at the time of the interrogation, appeared alert, free from the influence of any drugs or alcohol, and free from any mental deficiency or illness. We cannot say that any influence these statements by the police may have had on the defendant constitutes the sort of coercion that would override the will of the defendant and render his confession involuntary.

## IV ·

### A

Raymond appeals from the judge's sentencing him to consecutive life terms, one for rape and the other for murder in the first degree. " '[W]henever the possibility exists that a jury might have reached a verdict of murder . . . on the basis of a felony-murder theory, a consecutive sentence may not be imposed for the underlying felony.' *Commonwealth* v. *Wilson*, 381 Mass. 90, 124 (1980). The appropriate remedy for such duplicative convictions is to vacate both the conviction and the sentence on the lesser included offense, and to affirm the sentence on the more serious offense." *Commonwealth* v. *Berry*, 420 Mass. 95, 113 (1995). In this case, the jury returned a special verdict which specified that Raymond was guilty under all three theories of murder in the first degree, including felony-murder. Had the jury returned a verdict only under the theory of felony-murder or even if the jury returned a general verdict in which it was unclear under which theory it found the defendant guilty, the *Berry* rule would apply because the felony underlying the felony-murder verdict might

be nothing more than a lesser included offense of the felony-murder. Where, as here, the jury expressly reached a verdict of murder independent from felony-murder because of both extreme atrocity or cruelty and premeditation, then the rape is a separate and distinct crime. Both the rape and the murder convictions require "proof of an additional fact" not required by the other. *Commonwealth* v. *Buckley*, 410 Mass. 209, 222 (1991) (consecutive sentences for murder committed with extreme atrocity or cruelty and armed robbery not in error). Therefore, consecutive sentences for murder and rape are not in error.

### B

In Raymond's first motion for a new trial, he argued that, on the basis of an unsworn statement purportedly made by Stanislawski recanting his testimony and an affidavit by Raymond denying involvement, he was entitled to a new trial. At the hearing on this motion, Stanislawski refused to testify on the ground that he might expose himself to perjury charges. The motion judge found neither the statement from Stanislawski nor the affidavit from Raymond credible and denied the motion. Raymond filed a notice of appeal, but has not pressed this argument in his brief. We have long held that a new trial is not required based on affidavits or testimony that a key prosecution witness may have been lying, although we have said that such testimony warrants "serious consideration from the motion judge." *Commonwealth* v. *Watson*, 377 Mass. 814, 837-839 (1979). The determination whether such evidence warrants a new trial is left to the sound discretion of the trial judge. *Commonwealth* v. *Waters*, 410 Mass. 224, 230 (1991). We conclude that the judge did not abuse his discretion on this record, particularly in light of the fact that the statement by Stanislawski is unsworn and lacking in any other indicia of reliability. See *Watson, supra*; *Commonwealth* v. *Tobin*, 392 Mass. 604, 620 (1984).

### C

Raymond has filed a second motion for a new trial based on similar evidence. This time he argues that a letter sent by Stanislawski to Raymond's sister, who is also Stanislawski's former girl friend, states that Stanislawski knew he would be able to plea bargain to murder in the second degree when he

testified against Raymond in the trial. At the trial, Stanislawski had testified that he received no promises from the Commonwealth nor assurances from his own lawyer that he would receive a lesser penalty. Because this motion was filed shortly before this appeal, it has not been heard by a motion judge below, and we therefore remand it to the Superior Court on this issue. Mass. R. Crim. P. 30 (c) (7), 378 Mass. 900 (1979).

Raymond's second motion for a new trial also claims that the Commonwealth employed improper pressure on Stanislawski by threatening to prosecute him for perjury if he recanted his trial testimony. This argument also has not been addressed before and should be considered on remand.

Raymond's other two claims, that Stanislawski's statement was improperly introduced at trial and that the prosecutor improperly vouched for the credibility of Stanislawski, have been addressed in this opinion and need not be reheard below.

## D

We have reviewed the record as a whole and have found no reason to exercise our extraordinary powers under G. L. c. 278, § 33E, either to order a new trial or to reduce the verdict to murder in the second degree.

Accordingly, we affirm the convictions and the denial of the first motion for a new trial, and remand the case to the Superior Court for consideration of those arguments made in the second motion for a new trial which raise new claims not yet decided in that court.

*So ordered.*