NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-892                                          Appeals Court


COMMONWEALTH  vs.  ELVIS GARCIA.


No. 16-P-892.

Bristol.     April 9, 2018. - September 24, 2018.

Present:  Meade, Hanlon, & Blake, JJ.


Child Abuse.  Assault and Battery by Means of a Dangerous
    Weapon.  Reckless Endangerment of a Child.  Practice,
    Criminal, Instructions to jury, Argument by prosecutor,
    Duplicative convictions.



    Indictments found and returned in the Superior Court
Department on April 1, 2011.

    The cases were tried before E. Susan Garsh, J.


    John J. Connors for the defendant.
    Yul-mi Cho, Assistant District Attorney, for the
Commonwealth.


    HANLON, J.  After a jury trial, the defendant, Elvis

Garcia, was convicted of assault and battery on a child with

substantial bodily injury, G. L. c. 265, § 13J (b); assault and

battery by means of a dangerous weapon, G. L. c. 265, § 15A (b);

and reckless endangerment of a child, G. L. c. 265, § 13L.[1]  He now appeals, challenging the sufficiency of the evidence, various aspects of the judge's instructions to the jury, and the prosecutor's closing argument.  We affirm, and address the defendant's claims in turn.

1.  Background.  The jury heard the following evidence.[2]  On January 29, 2011, James,[3] the four year old victim, was admitted to Boston Children's Hospital (Children's Hospital) with a severe anal wound as well as extensive bruising over multiple areas of his body.  James was seven years old at the time of trial and he testified that the defendant, a friend of his mother, inflicted the bruises as well as the anal injury by hitting him with a belt.

James's mother[4] first developed a friendship with the defendant in the spring of 2010, shortly after the dissolution of her relationship with James's father.  James, then three years old, lived with his mother and his older sister and

---

[1] The defendant also was charged with one count of intimidation of a witness.  The judge allowed his motion for a required finding of not guilty as to that offense at the close of the Commonwealth's case; there was no objection.

[2] We recite the facts in some detail, given the issues presented.

[3] A pseudonym.

[4] The mother invoked her privilege under the Fifth Amendment to the United States Constitution and did not testify at trial.

brother in New Bedford.  For a number of years, the mother had been addicted to "pills,"[5] but, prior to June of 2010, she was able to keep her life "in control" and maintain her job as a hair stylist.

Prior to June of 2010, the apartment where the family lived was clean and "nice."  James attended day care full time, and his sister attended with him in the afternoon at the end of her school day.  Prior to June of 2010, James and his brother and sister appeared happy, clean, and normal.  James would see his maternal grandmother almost every day and, along with his siblings, would attend family parties and holiday gatherings.

After June of 2010, James's extended family saw the mother and James less frequently, and noticed that they attended fewer family events and parties.  James's siblings would sometimes attend family events when the mother and James did not.  Over the course of the summer and fall, on various occasions when family members did see James, some reported noticing bruises on his face.  The cleanliness of the family's apartment deteriorated, and the mother was terminated from her job after being increasingly absent and late.  During that time, both the mother and James were at the defendant's home almost every day.

---

[5] There is nothing in the record to indicate more specifically what kind of pills were at issue.

In addition, the mother frequently would leave James alone with the defendant, sometimes for hours or even days.

During the summer of 2010, James's day care teachers noticed that James began to change.  When he returned from a June vacation in Florida, James was distant and not like his usual self.  When he got in trouble, he would become particularly emotional and start to cry, which had not been the case previously.  The defendant started dropping James off on some days, and at one point told his teacher, "[I]f he doesn't listen, just tell him that you guys can . . . call me."  At the end of July, his teacher noticed that James began to cling to her "more than usual."  Also in July, a teacher noticed an apparent burn mark on James's inner thigh.  In August, on one occasion, she noticed scratches on his face.  Later that month, the defendant brought James in with a bruise on his cheek and said, "I'm sure he'll be perfect for you today."

Also, that month, the mother changed the emergency contacts and the list of individuals permitted to pick up James from day care; she removed all of the other family members who had been on the list, including James's grandmothers and others, leaving only herself and the defendant on the list.[6]  James, who had had very good attendance previously, began to be absent frequently

---

[6] The mother did not revoke the access of at least some of these family members for James's sister.

in July and August of 2010. In September, the day care program discharged him because of excessive unexcused absences.

In July of 2010, James's maternal grandmother came to visit the mother at work. The grandmother saw the defendant waiting outside in a car with James in his car seat. She was happy to see James as she had not seen him for a long time, and she ran to the car. James looked sad and was very quiet, and not like his normal self. As the mother came out of her workplace, the defendant told her forcefully to get into the car, ending the encounter.

In August of 2010, the mother allowed James's paternal grandmother to take him on a vacation to Florida. During the trip, James complained frequently that his "bum" hurt. He would sit sideways, and would cry when he went to the bathroom. His grandmother looked at the area and saw a small cut.

In mid-October, after James turned four years old, he visited with his maternal grandmother after a family apple-picking trip; this was the first time that she had seen James since July. Although James seemed happy, he told her that "his butt hurt." She gave him a bath, and observed that "his butt was red" and that he had a short, deep cut in the area.

On October 25, 2010, the mother took James to his pediatrician. The pediatrician observed a rash on James's scrotum, buttocks, and anal area. He prescribed an antibiotic,

an anti-inflammatory cream, and a medicine to protect the skin in the area. At a follow-up appointment on November 9, the doctor noted that there was a small ulcerative lesion around the anus, but that the rash did not seem worse, and had cleared on the buttocks. At a further follow-up visit three days later, he observed that the area appeared to be improving. On December 6, James returned to the office, and the doctor observed that the area appeared worse and had ulcers. He referred James to Children's Hospital the same day.

James was admitted to Children's Hospital on December 6, 2010,[7] where doctors observed an irregularly shaped ulcer under the scrotum, and another ulcer on his anal area. James underwent various tests and examinations to rule out potential causes of the ulceration. Doctors ruled out infection but were ultimately unable to determine a cause for his condition. At the time of his discharge, after a six-day hospitalization, James's condition had "improved somewhat," although the ulcers were still present.

In late 2010, James's maternal grandmother obtained the assistance of James's second cousin, who is an attorney, in filing a petition for legal guardianship of James. On January

---

[7] Medical staff noted during James's hospital stay that he had a faint black eye with some bruising underneath the left eye.

27, 2011, the petition was allowed after a hearing at which James's father assented to the guardianship and the mother did not appear. James's maternal grandmother had last seen James in the mother's car two days earlier at his sister's school. At that point, she noted that James was able to sit without complaining, and that he had no visible injuries.

After the cousin obtained guardianship of James on behalf of his maternal grandmother, the cousin was unable to locate either the mother or James until January 29, when the cousin was notified that the mother was in police custody. The mother refused to disclose James's specific location, but she eventually connected the cousin with Elizabeth Quinn, who was the girl friend of the defendant's best friend. The cousin engaged in "several conversations several minutes at a time" with Quinn over approximately twenty-five minutes, with male voices in the background of the telephone calls. Quinn eventually told the cousin to come to an intersection a couple of houses away from the defendant's home to receive James. Quinn directed her to report there with "no police."

Quinn then retrieved James from the defendant's apartment, where James was sleeping on the couch. She brought him to the agreed-upon street corner and handed him to the cousin, who was accompanied by a State police officer. James was having a difficult time walking. He was extremely upset and crying,

saying, "Make it go away," and that his "bum" hurt. He could not sit down. The cousin and the officer brought James to St. Luke's Hospital, where, a nurse later testified, "[h]e appeared afraid to me, he wouldn't . . . let me touch him." She observed "multiple bruises to his face, his eyes, a good per cent of his body, his back, his legs, arms." She identified photographs of the injuries she observed, including photographs of James's rectum, penis, and scrotum. The photographs were admitted in evidence. After several hours, hospital staff made a decision to transfer James to Children's Hospital.

At Children's Hospital, examination confirmed that James had extensive bruising and abrasions over multiple areas of his body, including his forehead, cheek, arms, back, waist, buttocks, inner and outer thighs, legs, and shins. Superimposed on the bruising on James's thigh were three curvilinear marks that were suggestive of having been struck by a "flexible implement that's been doubled" onto itself. He had a cut under his chin, and blood behind his right eardrum.

James also had a very deep anal wound: a widely split laceration extending from just behind his scrotum to his tailbone. His anus was completely detached from the skin around it and was "floating way up inside the buttocks." The wound had accumulated filth and fecal debris, and it appeared to be at least a couple of days old but was not infected. There was no

abscess and no evidence of ulceration that could explain the injury. James ultimately required surgery to reconstruct the area.

Dr. Steven Fishman, James's surgeon, opined that James's anal wound was induced externally by blunt force trauma, and that no natural disease process or hygiene issues could have created it. Dr. Fishman testified that, in over twenty years of experience as a pediatric surgeon, he had previously only seen a completely "floating" anus as a result of surgery. Dr. Fishman noted that, because of the tensile strength in the tissues in the area, if there is impact, there is a particular susceptibility to tearing in that spot. Without successful surgery to reconstruct his anus and perineum, Dr. Fishman testified that James risked having no control over defecation, or being unable to defecate.

On January 31, 2011, police officers went to the defendant's apartment to search the premises. They knocked on the door, loudly said "Police," and waited. No one came to the door. They knocked and announced themselves several additional times and, receiving no answer, kicked the door in and entered the apartment. The defendant was in the living room of the apartment at the time they entered.

Officers recovered a number of items from the defendant's apartment, including a black belt with a red-brown stain on the

buckle found in a white plastic trash bag in one of the apartment's bedrooms. Deoxyribonucleic acid analysis of the stain revealed a mixture of at least two individuals, with the profile of the major contributor to the sample matching James. The defendant and the mother were excluded as contributors to the mixture.

James testified that he had lived with the defendant along with his mother, who was "sometimes" there. James testified that he did not like spending time with the defendant because the defendant used to put "salt" in James's "butt," put James in an attic closet, and stuck James's head in the toilet. James testified that the defendant did each of these things more than once. As to the salt, James testified that it "looked like salt and it was white," and it "stinged a little bit" when the defendant used it. The defendant would bend him over, hold him down, and swirl the salt in a glass cup.[8] James said distinctly that the defendant put the "salt in my butt," rather than on it.

The defendant also would hit James "like everywhere" with a black belt. When he was shown images of the bruises on his body, James testified that the defendant had caused them with

---

[8] James indicated that the salt was not wet or mixed with water.

the belt.[9]  Shown an image of his anal wound, James testified
that the defendant had caused that wound with the belt as well.

2.  Discussion.  a.  Sufficiency of the evidence.  The
defendant argues that there was insufficient evidence for a
reasonable jury to find him guilty of assault and battery on a
child causing substantial bodily injury based on the theory that
the defendant caused the injury by striking James with a belt on
the buttocks.[10]  In particular, the defendant argues that the
Commonwealth's medical evidence was insufficient to demonstrate
that such a blow -- on the buttocks, as opposed to on the anus
or scrotum -- could have caused the injury.[11]  He also points to
his own expert's testimony in support of his argument.

In the light most favorable to the Commonwealth, there was
ample evidence for the jury to draw the conclusion that a strike
from the belt caused the injury; the judge limited the jury's

_____

[9] When presented with one image of his bruised hip area,
James reported that the defendant caused the injuries "[w]ith
the salt and the belt."  For all of the other images, James
testified that the defendant caused them with just a belt.

[10] The verdict slip for this charge offered the jury options
to find the defendant guilty based on one or both of two
theories:  "[t]ouching [James] in the area of his anus, scrotum,
or buttocks with a belt," and "[s]preading [James's] buttocks
cheeks."  The jury selected the former option and not the
latter.

[11] Although the defendant frames his argument as a flaw in
the judge's instructions offering the theory to the jury, we
view the challenge essentially as based in the sufficiency of
the evidence.

consideration, saying, "[F]or this particular charge, you must be satisfied that the Commonwealth has proved beyond a reasonable doubt that the defendant touched [James] in the area of his anus, scrotum or buttocks with a belt and/or by spreading his buttock cheeks. No other alleged touching is within the scope of this indictment." James testified at trial that the defendant caused the anal wound by hitting him with a belt. In addition to other circumstantial evidence, James's testimony was corroborated both by that of Dr. Fishman, who opined that blunt force trauma caused the wound, and by evidence of James's blood on a belt found in the defendant's home in a plastic bag. Expert testimony proffered by the defendant, to the effect that a blow to the buttocks would not have caused the wound because the buttocks would have protected the perineal area, did not cause the Commonwealth's case to deteriorate, as the jurors were entitled to discredit that testimony. See Commonwealth v. Bush, 71 Mass. App. Ct. 130, 137 (2008). We are satisfied that the judge's instructions fairly explained the charge to the jury; if there was any error in including a reference to the buttocks in the charge or on the verdict slip, the defendant did not object and we see no risk of a miscarriage of justice.

The defendant also argues that there was insufficient evidence for the jury to find him guilty on the charge of reckless endangerment of a child, because the Commonwealth did

not provide evidence that "the injuries the Commonwealth included as conduct under this theory created the risk of additional injury."  The defendant's argument appears to be premised on the mistaken belief that G. L. c. 265, § 13L, requires that the defendant's actions in creating the risk of injury not result in actual injury.  This is not an element of the offense.  A risk of injury may "come to fruition in the form of an actual injury."  Commonwealth v. Roderiques, 462 Mass. 415, 423 (2012) (defendant properly convicted of reckless endangerment of child where infant had fractures of arm, legs, ribs, spine, and clavicle).  Although actual injury is not required to satisfy the statute, it is not necessary that injury be absent.  Here, the jury could have properly found that the defendant's conduct in causing James's injuries created substantial risk of serious bodily injury.  There was no error.

b.  Jury instructions.  The defendant argues that it was improper for the judge to define bodily injury in the course of his instruction on the offense of assault and battery on a child causing substantial bodily injury.[12,13]  The defendant did not

_____

[12] Specifically, he contends, "When instructing the jury on the assault and battery on a child causing substantial bodily injury charge, the judge gave the statutory definitions of both substantial bodily injury and bodily injury and included the possibility that a blow with a belt to the buttocks caused the perineal injury.  The definition of bodily injury was not pertinent to the charge and there was no evidence that a belt to

the buttocks could have caused the perineal injury.  These errors combined to lower the Commonwealth's standard of proof and undercut a central theory of the defense."

[13] General Laws c. 265, § 13J, provides as follows:

"(a) For the purposes of this section, the following words shall, unless the context indicates otherwise, have the following meanings: --

"'Bodily injury', substantial impairment of the physical condition including any burn, fracture of any bone, subdural hematoma, injury to any internal organ, any injury which occurs as the result of repeated harm to any bodily function or organ including human skin or any physical condition which substantially imperils a child's health or welfare.

"'Child', any person under fourteen years of age.

"'Person having care and custody', a parent, guardian, employee of a home or institution or any other person with equivalent supervision or care of a child, whether the supervision is temporary or permanent.

"'Substantial bodily injury', bodily injury which creates a permanent disfigurement, protracted loss or impairment of a function of a body member, limb or organ, or substantial risk of death.

"(b) Whoever commits an assault and battery upon a child and by such assault and battery causes bodily injury shall be punished . . . .

"Whoever commits an assault and battery upon a child and by such assault and battery causes substantial bodily injury shall be punished . . . .

"Whoever, having care and custody of a child, wantonly or recklessly permits bodily injury to such child or wantonly or recklessly permits another to commit an assault and battery upon such child, which assault and battery causes bodily injury, shall be punished . . . .

object to the instruction at trial and, for that reason, "the claims he now raises on appeal are not preserved.  See Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979).  We therefore review to determine whether an error occurred and, if so, whether that error created a substantial risk of a miscarriage of justice." Commonwealth v. Arias, 84 Mass. App. Ct. 454, 464 (2013).

"A trial judge is obligated to instruct the jury on all aspects of pertinent law applicable to issues raised in the case so that the [jurors] understand[] the basis for their verdicts." Commonwealth v. Allen, 54 Mass. App. Ct. 719, 724 (2002).  It is proper for a judge to define technical terms in jury instructions.  Cf. Commonwealth v. Fuller, 421 Mass. 400, 411 (1995) (judge has discretion to define "mental disease or defect").  As noted, the statute, G. L. c. 265, § 13J (a), defines a substantial bodily injury as a "bodily injury which creates a permanent disfigurement, protracted loss or impairment of a function of a body member, limb or organ, or substantial risk of death."  As "bodily injury" is a part of the definition of substantial bodily injury in the statute, the judge here

---

"Whoever, having care and custody of a child, wantonly or recklessly permits substantial bodily injury to such child or wantonly or recklessly permits another to commit an assault and battery upon such child, which assault and battery causes substantial bodily injury, shall be punished . . . ."

(Emphasis supplied.)

acted properly in defining it.  Her definition closely tracked the definition recited in the statute, and the defendant does not contest its accuracy.  There was no error.[14]

c.  Closing argument.  The defendant claims that the prosecutor's closing argument was improper in several respects. While the Commonwealth concedes some errors in the prosecutor's summation, it argues that any misstatements were minor, and therefore do not warrant reversal.  As the defendant did not object at trial, we review the nine alleged errors individually to determine whether they were error and, if so, whether they created a substantial risk of a miscarriage of justice. Commonwealth v. Jones, 471 Mass. 138, 148 (2015).  "Remarks made during closing arguments are considered in context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury."  Commonwealth v. Andrade, 468 Mass. 543, 552 (2014), quoting Commonwealth v. Whitman, 453 Mass. 331, 343 (2009).  We also note that the judge told the jury that the opening statements and the closing arguments of counsel were not evidence, both before the arguments and again during her final instructions to the jury.

---

[14] If anything, including the statutory definition of bodily injury helped the defendant, by making it clear that the term has a specific meaning and forestalling any juror speculation about what might be sufficient to constitute bodily injury.

First, the defendant challenges the prosecutor's statement that the defendant and James's mother met in May of 2010. The Commonwealth concedes that this was a misstatement. The defendant is correct that no witness testified that the defendant and the mother first met in May of 2010. A friend of the defendant testified that the mother and the defendant spent time together in late 2009, and the defendant testified that he "knew of" the mother at the end of 2009. James's family members testified to meeting the defendant in May of 2010, or "late spring, early summer" of 2010. To the extent that the prosecutor's comment that the two met in May of 2010 constituted a misstatement, it was not a significant one. The defendant testified that he and the mother began to develop a friendship in May of 2010. That testimony supported with equal force the Commonwealth's argument that the relationship between the two coincided with a deterioration of the mother's parenting of James and with injuries and changes of behavior in James.

Second, the defendant challenges the prosecutor's statement that it took twenty minutes for Quinn and the defendant to "finally give up the child" after the arrival of James's cousin and the State trooper at the arranged meeting place; the cousin's testimony in fact was that it took two or three minutes after their arrival before Quinn arrived with James. The Commonwealth concedes that this also was a misstatement. As it

points out, however, the cousin's testimony was that there were about twenty-five minutes of "back and forth" telephone calls with Quinn before arrangements were finally made to give James to her. Those arrangements included Quinn's demand that there be no police present at the transfer. Because there was ample evidence of the difficulty the cousin experienced in securing James, any prejudice arising from that misstatement was also minimal.

Third, the defendant claims that there was no basis for the prosecutor to argue that, on January 29, 2011, the defendant "knew" that police would be coming to his home. Here, given James's extensive injuries at the time the defendant relinquished him from his custody, as well as the contentious circumstances of the transfer of custody, the jury reasonably could infer that the defendant would expect police contact shortly after James's injuries were discovered. A prosecutor may "zealously argue in favor of those inferences favorable to his or her case." Commonwealth v. Rakes, 478 Mass. 22, 45 (2017). "The inferences for which counsel argues need not be necessary, or inescapable; they only need be reasonable and possible." Id. We see no error in this portion of the prosecutor's argument.

Also, given this context, and contrary to the defendant's argument, the judge did not err in giving a careful

consciousness of guilt instruction based on testimony that the defendant "did not answer the door in response to repeated knocking by police."  Commonwealth v. Bruneau, 472 Mass. 510, 519 (2015).  The judge warned the jury, "You are not required to draw such an inference and must use great care and caution before you draw an inference of guilt from such evidence. . . . [Y]ou should always remember that there may be numerous reasons why an innocent person might do such things."  It was the province of the jury to evaluate the credibility of the defendant's alternative explanation for his delay.  See Commonwealth v. Morris, 465 Mass. 733, 738-739 (2013).

Fourth, the defendant claims that the prosecutor mischaracterized his testimony by stating that he had claimed that, while he cleaned or attempted to medicate James's anal area, James was "screaming and writhing in pain," and yet he did not see James's injury.  The defendant claims further that the prosecutor improperly stated that he testified that he put ointment on the injured area only once.

In fact, the defendant testified that he poured a mixture of warm water and "Epson [sic] salt" onto James's buttocks, that it "hurt [James] a lot," and that James "cr[ied]," "yelled," and

"screamed."[15]  He testified that, afterwards, he rinsed the area with plain water and put cream on it.  He said that he cleaned James in that manner only one time, and otherwise only used wipes to clean the area directly.  He testified that, when he was cleaning James in this way, he only saw James's scrotum area and not any of the anal wound, which would require spreading the cheeks of the buttocks to observe.  Because the defendant's testimony supported the prosecutor's statements, there was no error.

Fifth, the defendant claims that the prosecutor made several misrepresentations about the testimony of Dr. Elizabeth Laposata, the defendant's medical expert.  First, he argues that the prosecutor falsely stated that Dr. Celeste Wilson[16] and Dr. Laposata both had opined that the wounds on the child were inflicted.  In context, it would have been evident to the jury that this statement was a mere slip of the tongue, and that the

---

[15] The defendant claims in various portions of his brief that the prosecutor committed misconduct by falsely alleging that the defendant used salt on James's wound.  He claims that the "salt" at issue was Epsom salt as explained in the defendant's testimony, and was therefore intended to help James. James's testimony supported the prosecutor's statements, and neither the prosecutor nor the jury were required to accept the defendant's explanation.  See Commonwealth v. Cruz, 88 Mass. App. Ct. 206, 210 (2015).

[16] Dr. Wilson, the director of the child protection program at Children's Hospital, was called as a witness by the Commonwealth.

prosecutor had intended to refer to the two medical experts called by the Commonwealth:  Dr. Wilson and Dr. Fishman.  This error did not create a substantial risk of a miscarriage of justice.  See Commonwealth v. Thomas, 400 Mass. 676, 683 (1987) (no reversal for prosecutor's "slip of the tongue" where judge instructed jury that closing arguments are not evidence).

Sixth, the defendant argues that the prosecutor wrongly stated that Dr. Laposata "could not give [the jury] an explanation at all" for the mechanism of James's injury, that she blamed the purported escalation of James's injury over time on moisture, and that she opined that the injury was caused by James sitting on a "doggie pee pad."  In context, the prosecutor's claim that Dr. Laposata could not give the jury an explanation for the injury was in effect an argument that the doctor could offer no credible explanation for the injury.  That statement "falls into the category of 'enthusiastic rhetoric, strong advocacy, and excusable hyperbole,' and is not grounds for reversal."  Commonwealth v. Silva, 455 Mass. 503, 515 (2009), quoting Commonwealth v. Wilson, 427 Mass. 336, 350 (1998).

Dr. Laposata did testify that moisture could contribute to the body's failure to heal an ulcer, and that an ulcer could be worsened by exposure to urine.  The prosecutor's reference to that testimony therefore was proper.  As to the statement about

a dog pad, the prosecutor's remark in context is not wholly clear, but it appears that she intended to attribute this claim not to Dr. Laposata specifically, but to the defense more generally.  The defendant elicited evidence of such pads being around James's mother's home, and introduced James's statement, admitted only for impeachment, that "he sat on a doggy's pee pee pad and his bum hurt[]."  This section of the prosecutor's argument was inartful, but it was relatively brief.  To the extent that it constituted error, we see no prejudice.

Seventh, the defendant claims that the prosecutor introduced her personal beliefs into her closing argument, citing two statements.  He first challenges the statement, "You honestly don't believe, I don't, that that night . . . there was no conversation between [Quinn] and the defendant.  I submit to you, of course there was."  The Commonwealth concedes that the remark "I don't" was "inappropriate."

"A prosecutor may not express [her] personal belief in the testimony or suggest that [she] has knowledge independent of the evidence at trial."  Commonwealth v. Sanders, 451 Mass. 290, 296-297 (2008).  Although we agree that the phrase "I don't" was inappropriate, it was immediately followed by the proper wording, "I submit to you."  "The prosecutor was entitled to argue, as [she] was doing, that the jury should not arrive at particular interpretations of the evidence."  Commonwealth v.

Hogan, 375 Mass. 406, 408 (1978). In any event, the challenged remark was brief and unobtrusive, and it related to a tangential matter in the case. We note that such "[m]ere[] unfortunate and unartful isolated" remarks "are generally not enough to lead the jury to improper inferences drawn from presumed personal knowledge of the prosecutor." Commonwealth v. Raymond, 424 Mass. 382, 391-392 (1997), quoting Commonwealth v. Thomas, 401 Mass. 109, 115 (1987). "The absence of objection from defense counsel further convinces us that taken in the context, the remark would not likely have misled the jury or prejudiced [the defendant]." Raymond, supra at 392.

Eighth, the defendant also challenges the prosecutor's sarcastic statement, "That really is a valid argument," as improper vouching. The statement at issue was made in the context of the prosecutor's argument that mere familial disputes did not fully explain James's mother's removal of family members from James's day care access list. The challenged remark was, in fact, a criticism of a defense argument rather than any intimation of personal knowledge. Though often better avoided, sarcasm is permitted in closing arguments. See Commonwealth v. Brum, 438 Mass. 103, 119 (2002). There was no error.

Finally, the defendant challenges the prosecutor's characterization of the defendant as "a drug user" and his friends as "all drug users." The characterization was brief,

not inflammatory, and based on the evidence.  The defendant testified regarding his own drug use and that of his friends. He referred to this testimony during his own closing argument. The statement was proper.

d.  <u>Duplicative convictions</u>.  For the first time in his reply brief, the defendant claims that his convictions of assault and battery on a child with substantial bodily injury and reckless endangerment of a child are duplicative.[17]  "We need not pass on grounds for reversal raised for the first time in a reply brief."  <u>Commonwealth</u> v. <u>McGowan</u>, 400 Mass. 385, 390 n.4 (1987).  Nonetheless, the defendant's argument is unavailing, because the two crimes have separate elements.

A defendant "may properly be punished for two crimes arising out of the same course of conduct."  <u>Commonwealth</u> v. <u>Torres</u>, 468 Mass. 286, 288-289 (2014), quoting <u>Commonwealth</u> v. <u>Valliere</u>, 437 Mass. 366, 371 (2002).  "A lesser included offense is one which is necessarily accomplished on commission of the greater crime."  <u>Commonwealth</u> v. <u>D'Amour</u>, 428 Mass. 725, 748 (1999).  "As long as each offense requires proof of an additional element that the other does not, 'neither crime is a lesser-included offense of the other, and convictions on both

_____

[17] Although the defendant did not raise this issue in his initial brief or below, the Commonwealth's brief addressed the issue.

are deemed to have been authorized by the Legislature and hence not [duplicative].'" Commonwealth v. Vick, 454 Mass. 418, 431 (2009), quoting Commonwealth v. Jones, 382 Mass. 387, 393 (1981). In this analysis, "[t]he actual criminal acts alleged are wholly irrelevant to the application of [the rule]; rather, the elements of the crimes charged are considered objectively, abstracted from the facts. . . ." Commonwealth v. Jones, 441 Mass. 73, 76 (2004), quoting Commonwealth v. Jones, 59 Mass. App. Ct. 157, 162 (2003).

We turn now to the statutes at issue in the case at bar. General Laws c. 265, § 13J (b), second par., in relevant part, provides, "Whoever commits an assault and battery upon a child and by such assault and battery causes substantial bodily injury shall be punished." General Laws c. 265, § 13L, in relevant part, provides, "Whoever wantonly or recklessly engages in conduct that creates a substantial risk of serious bodily injury or sexual abuse to a child . . . shall be punished." For purposes of § 13L, the statute specifies that wanton or reckless behavior occurs only where a defendant "is aware of and consciously disregards" the risk at issue. Id. The risk must be "of such nature and degree that disregard of the risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." Id.

Comparing the elements of the two offenses reveals that each offense requires an element that the other does not. Section 13J (b), second par., requires both a touching and an injury, where § 13L requires only conduct that creates substantial risk of injury.  Section 13L requires proof of a "defendant's subjective state of mind with respect to the risk involved.  That is, he must be shown to have been actually aware of the risk" of serious bodily injury.  Commonwealth v. Coggeshall, 473 Mass. 665, 670 (2016).  Section 13J (b), second par., a general intent crime, requires only that the defendant intended to engage in the touching.  See Commonwealth v. Cabral, 46 Mass. App. Ct. 917, 918 (1999).  Because each crime requires an element that the other does not, neither crime is a lesser included offense of the other.

In support of his argument, the defendant relies principally on Roderiques, 462 Mass. at 424, where the court held that G. L. c. 265, § 13L, is a lesser included offense of G. L. c. 265, § 13J (b), fourth par.  In Roderiques, however, the court compared the elements of § 13L with those of the fourth paragraph of § 13J (b), which criminalizes "child abuse resulting from acts of omission" -- wantonly or recklessly permitting substantial bodily injury to a child, or wantonly or recklessly permitting another to commit an assault and battery on a child, causing substantial bodily injury.  Roderiques,

supra at 423.  Because the elements compared in that case were different from those at issue here, the defendant's reliance is inapposite.

Judgments affirmed.