**UNITED STATES of America,**
**Plaintiff,**

v.

**Bryant FEYLER, Defendant.**

**No. Crim. 98–61–P–C.**

United States District Court,
D. Maine.

June 17, 1999.

**56**

George T. Dilworth, AUSA, Helene Kazanjian, AUSA, Office of the U.S. Attorney, Portland, Maine, for the Government.

Bruce M. Merrill, Portland, Maine, for Bryant Feyler.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT FEYLER'S MOTION TO SUPPRESS

GENE CARTER, District Judge.

On January 25, 1999, Defendant Bryant Feyler filed a Motion to Suppress, asserting that his post-arrest statements "were given at a time when the Defendant's mental and physical condition were compromised due to the influence of drugs and that any Law Enforcement Agents knew, or should have known, that the Defendant was incapable of making a voluntary, intelligent confession." Memorandum of Law in Support of Motion to Suppress of De-

fendant Bryant Feyler (Docket No. 36) at 1. Shortly after filing that motion, Defendant Feyler's counsel withdrew and substitute counsel was appointed. *See* Docket No. 41. The Court held an evidentiary hearing on Defendant's motion on March 11 and 24, 1999. At the close of the hearing, Defendant's new counsel requested leave of the Court to amend the Motion to Suppress. The Government did not object, and the Court permitted Defendant the opportunity to amend in light of the testimony at the hearing.

Defendant now moves to suppress the post-arrest statements he made to law enforcement officers on the grounds that the statements were not voluntarily made. Defendant also argues that he was not properly advised of his *Miranda* rights before he was interrogated or, if he was properly advised of his rights, the waiver was invalid because he did not sign a written waiver-of-rights form. The Government responds that Defendant was properly advised of his rights according to *Miranda*, that he made a valid waiver of his rights to confess to law enforcement officers, and that the statements he made were a product of his own free will. The Court agrees with the Government and will deny Defendant's Motion to Suppress.

### I. FACTS

The facts revealed at the hearing are as follows. At approximately 11:30 on October 29, 1998, Joseph Robitaille, a special agent with the Bureau of Alcohol, Tobacco and Firearms, went to an apartment in Kennedy Park with three Portland Police officers to execute an arrest warrant for Bryant Feyler. Transcript I ("Tr.I") at 3–4; Transcript II ("Tr.II") at 41.[1] Feyler was not at the apartment, but as the officers began to leave, they spotted Feyler driving into the parking lot. Tr. I at 5–6. Defendant was subsequently arrested at gunpoint. Tr. I at 6.

1. "Transcript I" or "Tr. I" refers to the transcript of the March 11 hearing and "Transcript II" or "Tr. II" refers to the transcript of the March 24 hearing.

After his arrest, Feyler was placed in a marked police vehicle and taken to the U.S. Marshals' lockup. Tr. I at 7, 9. On the way, the police explained that they would make his cooperation known to the United States Attorney's office. Tr. I at 9. Defendant responded "What do I do? What do you want me to say? What do you want me to do?" Tr. I at 9. The police told Defendant that they were looking for his codefendant, Coleman "Joey" Beeler. Tr. I at 9. Defendant said that Beeler had spent the previous night at the Anchor Inn in South Portland. Tr. I at 9. Defendant cried on the way to the Marshals' lockup. Tr. I at 118–19. Robitaille and Portland Police Officer Kevin Cady left the Defendant at the Marshals' lockup in Portland and traveled to the Anchor Inn to look for Beeler. Tr. I at 10–11.

In the meantime, Assistant U.S. Attorney Helene Kazanjian telephoned Deputy Marshal Kathryn Spellacy and requested that Deputy Spellacy advise Defendant of his rights and ask if he wanted to give a statement.[2] Tr. II at 3–4. Deputy Marshals Michael Galvin and Spellacy took Defendant into a conference room at approximately 12:20 p.m. Tr. II at 5. The conference room is about 25 feet by 15 feet, with a conference table surrounded by 12 chairs and a large armoire. Tr. II at 5. Spellacy sat across the table from Defendant, and Galvin sat to his immediate right. Tr. II at 5–6. Spellacy then explained to Defendant that she wanted to talk to him about what occurred on the night that the car was bombed in Yarmouth and that law enforcement officers were looking for Joey Beeler. Tr. II at 8. Galvin then read to Defendant—slowly, one line at a time—the official *Miranda* rights card issued by the Marshals Service.[3] Tr. II at 6–7; Govt. Ex. 11. After Galvin finished reading Defendant his rights, he asked if Defendant understood his rights and Feyler replied that he did. Tr. II at 6, 27. Defendant then agreed to waive his rights and answer questions. *Id.*

Though admittedly knowing nothing about the car bombing, Spellacy began to question Defendant about the incident. Tr. II at 6, 8. At that point, Defendant asked Spellacy some questions.

Q: Did he ask you—did he ask you any questions?

A: Yeah, he was concerned if he was doing the right thing. We explained to him that the right thing is always to tell the truth. That it was important to us to find Joey Beeler because he was involved, and we wanted to talk to him. He was very concerned about his girlfriend. I guess his girlfriend is Mr. Beeler's sister. And he wondered by cooperating and helping us if he would lose his girlfriend. It was very upsetting for him. That was pretty much it.

Q: Did he ask whether his cooperation would help him?

A: Yes, he did.

Q: What did you say?

A: I said it always helps to tell the truth.

---

**2.** The reason for this, as explained to Spellacy, was that Robitaille and Cady were not available to interview the Defendant. Tr. II at 3–4.

**3.** The card reads:

Before we ask you any questions, it is my duty to advise you of your rights.
You have the right to remain silent.
Anything you say can and will be used against you in a criminal proceeding.
You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during the questioning.
If you cannot afford a lawyer, one will be appointed for you, if you wish, before any questioning begins.
If you decide to answer questions without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
Do you understand your rights?
Are you willing to waive your rights and talk with us?
Govt. Ex. 11.

Tr. II at 6–7. At points during the interview, the Defendant cried and said that he didn't want to lose his girlfriend. Tr. II at 13. Defendant described the events of July 1997, including his own role in the car bombing, to Spellacy and Galvin. Tr. II at 8; Govt. Ex. 12. Defendant was cooperative, and he never expressed any change of heart about talking to the law enforcement officers. Tr. II at 25. Defendant never showed reluctance to talk to Spellacy. Tr. II at 26.

Robitaille returned to the Marshals' lockup after learning that Beeler had checked out of the Anchor Inn one-half hour earlier. Tr. I at 9–11. Spellacy told Robitaille that Feyler had been read his *Miranda* warnings and interviewed. Tr. II at 12–13. Spellacy then showed Robitaille a copy of her report of the interview, which she had just completed. Tr. I at 13. Robitaille then asked to have Feyler brought from the lockup into the conference room. *Id.* Initially, Feyler asked whether they had found Beeler. Tr. I at 14. At that time, Feyler suggested that Beeler might be at his sister or father's house. *Id.*

Robitaille told Feyler that he had been advised that Feyler had been read a *Miranda* warning, that he had waived those warnings and voluntarily made a statement. Tr. I at 14. Robitaille also informed Feyler that he did not need to speak with him but that, if he chose to do so, he would listen to him. *Id.* Feyler said he wanted to talk to Robitaille. *Id.* Feyler subsequently asked Robitaille whether Spellacy had to be there. Tr. I at 14–15. Robitaille asked Feyler why he was con-

cerned about Spellacy's presence, and Defendant replied that he may have lied to her. Tr. I at 15. Robitaille then reinterviewed Feyler. Tr. I at 15–39. Feyler described the circumstances of the July 1997 car bombing to Robitaille, including his role in the car bombing. Tr. I at 17–30, 36–37.

Eric Storms, the U.S. Probation Officer assigned to conduct the pretrial services interview, first saw the Defendant with Robitaille in the Marshals' conference room. Tr. II at 33. Feyler appeared normal and alert, and he was not crying. *Id.* Storms completed the Financial Affidavit and took it to the Clerk of Courts' office. Tr. II at 34. Later that afternoon, around 2:00 p.m., right after Defendant had finished his interview with Robitaille, Storms began his pretrial services interview. Tr. II at 37–38. Storms advised the Defendant of his rights, including his right to have an attorney present. Tr. II at 40. Although Defendant cried a bit at the beginning of the pretrial services interview, he soon stopped and was cooperative throughout the interview. Tr. II at 49–50.

## II. DISCUSSION

Defendant now moves to suppress the statements he made to Robitaille and Spellacy on the grounds that the statements were not voluntary.[4] Specifically, Defendant argues that he was emotionally unbalanced at the time he was questioned and that his will was thus overcome by the law enforcement personnel who interrogated him. In the alternative, Defendant argues that he was not properly advised of his *Miranda* rights before interrogation or, if

4. Defendant's first Motion to Suppress argues, and his supplemental brief continues to halfheartedly assert, that his will was overcome as a result of his ingestion of drugs. Amended Motion to Suppress (Docket No. 59) at 2 (Defendant broadened the scope of his original motion "by asserting that his mental condition on that date was not, necessarily, solely caused by his ingestion of drugs."). The Court heard absolutely no evidence that could lead it to conclude that Defendant was under the influence of any drug on the day of

his arrest and interrogation. Each of the five witnesses testified that Defendant appeared lucid and sober on the day of his confession. Tr. I at 94, 112, 128; Tr. II at 22–23, 45. In fact, when asked about his drug use, Defendant expressly denied using drugs or alcohol that day. Tr. I at 125; Tr. II at 43; Govt. Ex 6. The Court thus finds that neither drugs nor alcohol was a factor in the voluntariness of the statements Feyler gave to the law enforcement officers.

he was properly advised, the waiver was invalid because no written waiver of rights was obtained by the deputy marshals. The Government responds that Defendant was properly advised of his rights according to *Miranda*, that he made a valid waiver of his rights to the law enforcement officers and that the statements he made were a product of his own free will.

■ The evidence unquestionably shows that Defendant was properly advised of his *Miranda* rights by Deputy Galvin. Galvin read to Defendant, line by line, from the standard card used by the U.S. Marshals Service to advise suspects of their constitutional rights. *See* Govt. Ex, 11. After Galvin finished reading Defendant his rights, he asked Defendant if he understood his rights, and Defendant replied that he did and that he was willing to waive his rights. Tr. II at 6, 27. The record clearly establishes that Defendant was properly advised of his rights according to *Miranda*. The Court further finds that his waiver was not invalid because of the lack of a waiver of rights form. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires only that the waiver of rights be made voluntarily, knowingly, and intelligently, not that it be made in writing. The Court is convinced that Defendant's waiver met the *Miranda* requirements.

Defendant next asserts that, given his condition, Deputy Spellacy's statement that "the right thing is always to tell the truth," was psychological coercion. Specifically, Defendant argues that after his arrest, he was in a weakened psychological condition as a result of his young age, lack of formal education, and his concern for his girlfriend; and that Spellacy's statement compounded his condition to the point of rendering his statements involuntary, thus, making his waiver of *Miranda* rights a nullity. The Government responds that Spellacy's statement was not coercive and that Defendant knowingly, intelligently, and voluntarily waived his rights.

■ Since *Miranda*, the Supreme Court has developed the parameters of the showing of waiver required of the government:

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

*North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979) (footnote omitted). In determining the validity of a waiver, the Court should consider the totality of the circumstances surrounding the interrogation, including the defendant's age, experience, education, background, intelligence, familiarity with the criminal justice system, and his physical and mental condition. *See Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979); *Butler*, 441 U.S. at 374–75, 99 S.Ct. at 1758; *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Defendant was twenty-one years old when he was arrested, and it was not his first arrest. Defendant does not dispute that Deputy Galvin read the *Miranda* warnings to him, or that he understood his constitutional rights. The pretrial services

worksheet admitted in evidence at the suppression hearing indicates that Defendant attended Portland High School until he reached twelfth grade, at which time he dropped out for failure to complete the necessary credits to graduate. *See* Govt. Exs. 5 and 13. Defendant asserts that at the time of his interrogation, he was emotionally distraught over his girlfriend—the sister of his codefendant, Coleman Beeler. This emotional distress presumably resulted from Defendant's concern over how his cooperation would impact his relationship with his girlfriend.

Although Defendant was upset, and even cried at various points during the interrogations, nothing in the record tends to show that Defendant's mental condition was weakened after his arrest to any degree cognizable under the law. Whatever stress or anxiety Defendant felt was not greater than that which is experienced by suspects generally when considering their post-arrest alternatives.

■ In determining whether a statement was made voluntarily, courts examine the conduct of law enforcement officials in creating pressure, and the suspect's ability to resist that pressure. *See Mincey v. Arizona,* 437 U.S. 385, 398–402, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Coercion is a necessary element to establish that a statement was made involuntarily. *See Colorado v. Connelly,* 479 U.S. 157, 163–64, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The only claimed coercion was Deputy Spellacy's repeated response to Feyler's questions that the right thing to do was to tell the truth. The Government argues that informing a suspect that "it is best to tell the truth" regarding information he possesses does not render a confession involuntary.

Advising a defendant that it is always best to tell the truth is arguably a truthful statement from a law enforcement perspective. The Court of Appeals for the First Circuit has held a confession voluntary even though a law enforcement officer told a suspect that the best thing he could do was cooperate and promised to bring such cooperation to the attention of the United States Attorney. *United States v. Baldacchino,* 762 F.2d 170, 178–79 (1st Cir.1985). Other courts have held that " 'a law enforcement officer may properly tell the truth to the accused.' " *United States v. Pelton,* 835 F.2d 1067, 1072 (4th Cir. 1987) (quoting *United States v. Williams,* 479 F.2d 1138, 1140 (4th Cir.1973)). Indeed, "[t]ruthful statements about [a defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary." *Id.* at 1073; *see also Rivers v. United States,* 400 F.2d 935, 943 (5th Cir.1968) (holding that postal inspector's reference to 18 U.S.C.A. § 1001 during a custodial interview was not coercive but "merely emphasized that if [the suspect] was going to say anything, he had best tell the truth.").

■ Here, Spellacy made the questionable statement in response to Defendant's question regarding whether he was doing the right thing. Spellacy did not intimate to Defendant that he had a duty to speak, only that if he spoke, it would be best if he did so truthfully. Advising or admonishing a suspect to tell the truth during an investigatory interview does not constitute coercive law enforcement conduct rendering a statement involuntary. At the time of his arrest, Defendant was an adult who, by virtue of his previous arrests, was familiar with the criminal justice system. He was apparently experiencing some degree of distress over how his behavior would bear on his relationship with his girlfriend. Before questioning began, he was informed of his constitutional rights and stated that he understood those rights. He was alert and answered the questions put to him responsively. In the course of doing so, he twice confessed. The record in no way suggests that law

enforcement officers exerted any improper influence over Defendant. The Government has, therefore, satisfied its burden of showing that Defendant's statements manifested a voluntary, knowing, and intelligent waiver of his right to remain silent.[5]

5. An argument, not raised by Defendant, to which the Court has given serious consideration is whether Defendant was invoking his right to counsel when he asked Deputy Spellacy what was the right thing to do and whether she violated that right by responding that he should tell the truth. Despite the disconcerting nature of this exchange, the Court cannot conclude that Defendant's right to counsel was violated. In *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), the Supreme Court held that law enforcement officers must immediately cease questioning of a suspect who clearly asserts his right to have counsel present during interrogation. The issue left open by *Edwards* was how law enforcement should respond when a suspect makes a reference to counsel that is ambiguous or otherwise insufficiently clear.

In *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court declined "to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." *Id.* at 459, 114 S.Ct. 2350. The Court held that "after a knowing and voluntary waiver of *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney" and "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461–62, 86 S.Ct. 1602. The "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of desire for the assistance of an attorney.'" *Davis*, 512 U.S. at 459, 114 S.Ct. 2350 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991)). "If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." *Id.* The Court explained that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might be* invoking the right to counsel, our precedents do not require cessation of questioning." *Id.* (emphasis added).

In reaching this result, the Court considered the information-gathering function of law enforcement. First, the Court recognized that

> when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity," ... because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present.

*Id.* at 460, 86 S.Ct. 1602 (quoting *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975)). Second, the Court considered that *Edwards* "provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information.... If we were to require questioning to cease if a suspect makes a statement that might be a request for an attorney, this clarity and ease of application would be lost." *Id.* at 461, 114 S.Ct. 2350. In weighing the interests at stake, the Court stated:

> We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves.

*Id.* at 460, 114 S.Ct. 2350. Finally, the Court stated that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Id.* at 461, 114 S.Ct. 2350.

In this case, Defendant twice asked Deputy Spellacy, in essence, what was the right thing to do. Spellacy undertook to give Defendant her moral point of view. However, for a suspect caught up in the toils of the law, it is not always and undisputably "right," in terms of his own legal self-interest, to tell the truth. Indeed, it can be persuasively argued that it is *never* right for him to do so until he has talked with his lawyer. It is because these propositions are so transparently self-evident that

## III. CONCLUSION

Accordingly, it is **ORDERED** that Defendant's Motion to Suppress be, and it is hereby, **DENIED**.

constitutional and legal protections assure him the right not to say anything. The suggestion to a defendant that he should tell the truth is advantageous to the investigators, while from a defense standpoint, the best thing to do is normally not to be quite so forthright. Moreover, if telling the truth is the chosen path, a properly advised defendant does not often undertake this action prior to discussions between his counsel and the prosecutor.

Defendant's questions here are indeed ambiguous and, thus, he is not entitled to the protection afforded by *Edwards*. Nevertheless, the Court has had acute concern that Defendant may have been asking for *legal* advice. If that was the case, law enforcement personnel are certainly not in a position to give legal advice to a defendant. It is for a suspect's attorney to advise him of what the "right thing to do" is in any given situation. Under these circumstances, a wiser course for Deputy Spellacy to have pursued would have been to clarify whether Defendant wanted to speak to an attorney.