The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Efren MIRANDA–OLIVAS,
Defendant–Appellee.

No. 01SA227.

Supreme Court of Colorado,
En Banc.

Oct. 29, 2001.

A.M. Dominguez, Jr., District Attorney, Nineteenth Judicial District, Michele Meyer, Deputy District Attorney, Greeley, CO, Attorneys for Plaintiff–Appellant.

Michael Varallo, Greeley, CO, Attorney for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

In this interlocutory appeal pursuant to C.A.R. 4.1, the People seek reversal of the trial court's suppression of statements made by Defendant to police on April 9, 2001. The trial court ruled that a police officer's statement to Defendant that he did not want to see Defendant's girlfriend "get drug into this thing if not actively involved" was "tantamount to a valid threat to arrest a woman who he had no reason to believe was involved," rendering Defendant's statements involuntary as the product of coercive conduct.

The record does not support the trial court's finding that Defendant's statements were involuntary as the product of coercive conduct by police. Instead, in reviewing the totality of the circumstances surrounding Defendant's statements, we find that the record demonstrates that Defendant's statements were not the result of any force, threats, promises, or other forms of undue influence exerted by police. Thus, Defendant's will was not overborne by police and his statements were voluntary. We therefore reverse the suppression order and remand the case for further proceedings.

## I.  FACTS AND PROCEDURAL HISTORY

Defendant was charged with one count of possession of a schedule II controlled substance, 450–1000 grams, with intent to distribute, § 18–18–405(3)(a)(II), 6 C.R.S. (2001). These charges arose out of a police search of Defendant's residence. The original target of the search warrant was Joaquin Anchondo Villalobos, Defendant's uncle.

At the start of the search, police escorted Defendant, at gunpoint, with his pregnant girlfriend,[1] Claudia Lechuga, from a bedroom in the house into the front yard and handcuffed him behind his back. Officer Schrimpf, an investigator involved in the execution of the search warrant, testified, "Mr. Olivas was very nervous, and he made a statement saying, I know that—like this is pretty close to what he said, I know my uncle is in some bad shit. I'll tell you anything you want to know. He made a spontaneous statement to that effect." (R. at vol. II, p. 19.) After Sergeant Black, the officer in charge of the task force personnel executing the search warrant, arrived at the scene, he advised Defendant that he was not under arrest; however, because the officers believed Defendant might perceive he was under arrest, Sergeant Black advised Defendant of his *Miranda* rights. Defendant indicated that he understood his rights and agreed to answer questions. According to

---

1. The record is unclear as to whether Ms. Lechuga is Defendant's girlfriend or wife.

Officer Schrimpf, Defendant told Sergeant Black that he did not know anything, that he only recently moved into the residence, and that he was scared and nervous. At that point, Officer Schrimpf confronted Defendant and told him that he did not believe him, given his earlier spontaneous outburst, and that it was important for him to tell the truth.

Officer Schrimpf then spoke with Lechuga who told him that Defendant had been present during the narcotics transactions with his uncle; that Defendant required her to go into the bedroom during the transactions because he did not want her involved; and that Defendant had hidden a couple of handguns in the house. After speaking with Lechuga, Officer Schrimpf confronted Defendant again, telling him that he knew he was lying. Officer Schrimpf also testified that he told Defendant that he "didn't want to see Claudia get drug into this thing if not actively involved" while emphasizing to Defendant the importance of telling the truth.[2] (R. at v. II, p. 27.)

Defendant then admitted that he had been present during several drug transactions and that he had accompanied his uncle on two occasions when his uncle sold cocaine. He also told Officer Schrimpf the location of drugs in the house. Although Officer Schrimpf was armed, he kept his gun in his holster while speaking with Defendant, who was seated, still handcuffed, on the couch in the living room during the second conversation with Officer Schrimpf. The conversation was in English and lasted approximately thirty minutes, including the time during which Officer Schrimpf spoke with Lechuga. Defendant did not ask to speak to a lawyer nor did he indicate a desire to stop speaking with police. Officer Schrimpf made no promises to Defendant in order to entice him to give a statement.

**2.** Officer Schrimpf testified that he did not know Lechuga was pregnant at the time of questioning.

**3.** The one-part test for determining whether an inculpatory statement was made voluntarily for purposes of the Due Process Clause of the Fourteenth Amendment must be distinguished from the two-part test for determining the validity of an alleged waiver of one's Fifth Amendment

At trial, Defendant pleaded not guilty and filed a motion to suppress the statements he made to police during the interviews on April 9, 2001. At the suppression hearing, the state presented testimony from the police officers involved in the questioning of Defendant. The defense did not present any testimony. After the hearing, the trial court granted Defendant's motion in part. It held that Defendant's statements before Officer Schrimpf "made the statement to Mr. Miranda that his girlfriend would be arrested, and otherwise implied she would be in trouble if he didn't fess up" were voluntary and intelligent, but Defendant's statements after Officer Schrimpf's statement were involuntary and the product of coercive conduct by the police. The trial court also ruled that up to the point of Officer Schrimpf's statements about Lechuga, Defendant was in custody and intelligently and knowingly waived his *Miranda* rights. This appeal followed.

## II. ANALYSIS

### A. VOLUNTARINESS

■ The Due Process Clause of the Fourteenth Amendment prohibits admission of involuntary statements into evidence.[3] *Colorado v. Connelly*, 479 U.S. 157, 181–82, 184, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). When a defendant challenges the voluntariness of a statement, the prosecution must establish by a preponderance of the evidence that the defendant's statement was voluntarily made. *People v. Valdez*, 969 P.2d 208, 210 (Colo.1998).

■ "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Police coercion includes not only physical abuse or

rights under *Miranda*. When *Miranda* rights attach, i.e., when the person is subjected to a custodial interrogation, the inquiry includes not only whether or not the waiver was made voluntarily, but also whether the waiver was made knowingly and intelligently. Because Defendant did not argue on appeal that his waiver was not knowing and intelligent, we address only the voluntariness of Defendant's statements.

threats directed at a person but also subtle forms of psychological coercion. *People v. Gennings,* 808 P.2d 839, 843–44 (Colo.1991) (citing *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Although a defendant's mental condition does not by itself and apart from its relation to official coercion resolve the issue of constitutional voluntariness, *Valdez,* 969 P.2d at 211 (citing *Connelly,* 479 U.S. at 164, 107 S.Ct. 515; *Gennings,* 808 P.2d at 844), "the deliberate exploitation of a person's weaknesses by psychological intimidation can, under certain circumstances, constitute coercion rendering a statement involuntary." *Valdez,* 969 P.2d at 211 (citing *Gennings,* 808 P.2d at 844). Moreover, police must not make any direct or implied promises or exert an improper influence in order to obtain the statement, *People v. Medina,* 25 P.3d 1216, 1222 (Colo.2001) (citing *People v. Quintana,* 198 Colo. 461, 464, 601 P.2d 350, 351 (1979)), and "[c]oercive physical or psychological conduct by the government renders an otherwise voluntary statement involuntary, if the conduct plays a significant role in inducing the statement." *Medina,* 25 P.3d at 1222.

■■■ Ultimately, the test of voluntariness is whether the individual's will has been overborne. *Valdez,* 969 P.2d at 211. In determining whether a confession or inculpatory statement is voluntary, a trial court should analyze the totality of circumstances under which the statement was made. *Gennings,* 808 P.2d at 844 (citing *Mincey v. Arizona,* 437 U.S. 385, 401, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). These factors include, but are not limited to: whether the defendant was in custody or was free to leave and was aware of his situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda* rights; whether the defendant had the opportunity to confer with counsel or any one else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or was instead volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immedi-

ately prior to and during the interrogation as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system. *Gennings,* 808 P.2d at 844.

## B. DEFENDANT'S STATEMENTS

■■■ A trial court engages in both fact-finding and law application when it rules on a motion to suppress a confession or inculpatory statement. *People v. Gennings,* 808 P.2d 839, 844 (Colo.1991) (citing *People v. Quezada,* 731 P.2d 730, 732 (Colo.1987)). In reviewing suppression appeals, we grant deference to a trial court's findings of historical fact that are supported by competent evidence in the record. *People v. Pitts,* 13 P.3d 1218, 1221 (Colo.2000); *Quezada,* 731 P.2d at 732 (trial court's findings of fact will not be overturned if supported by competent evidence in the record). Where, however, findings of fact are clearly erroneous or not supported by the record, we set them aside. *People v. Mendoza–Balderama,* 981 P.2d 150, 158 (Colo.1999); *Gennings,* 808 P.2d at 844 (reversing a suppression order after ruling that the trial court's findings were not supported by competent evidence in the record). Thus, both a trial court's application of an erroneous legal standard in resolving a suppression motion and a trial court's ultimate legal conclusion of constitutional law that is inconsistent with or unsupported by evidentiary findings is subject to correction on review. *Id.*

■■■ In *People v. D.F.,* we said, "When . . . the controlling facts are undisputed, the legal effect of those facts constitutes a question of law." 933 P.2d 9, 15 (Colo.1997). Moreover, where the record below reveals no conflicting evidence regarding the details of the encounter, remand is unnecessary where the appellate court can apply the correct legal standard. *People v. Johnson,* 865 P.2d 836, 840 (Colo.1994).

In this case, the controlling facts are undisputed. Therefore, whether Defendant's statements were involuntary is a question of law. We conclude that the district court's holding that Defendant's statements made after Officer Schrimpf's remark about Lechuga were involuntary is not supported by the

record. Our review of the totality of the circumstances convinces us that Defendant made the statements to police voluntarily.

First, although the record supports the trial court's finding that Defendant was in custody,[4] police informed Defendant of his *Miranda* rights and Defendant understood and waived those rights. Second, Defendant did not request counsel after police gave him the *Miranda* advisement. Therefore, although Defendant did not confer with counsel or anyone else before making a statement and made the statement while being interrogated, he was given the opportunity to consult counsel if he so wished. Third, although Defendant was clearly nervous, Officer Schrimpf testified that his own demeanor was calm and polite during the interrogation and that the interview lasted no more than thirty minutes.[5] While the trial court considered the fact that Defendant was in custody during the interrogation and that he made a knowing and intelligent waiver, it failed to analyze these factors or the others listed above in determining that Defendant's statement was involuntary. Rather, it relied solely on Officer Schrimpf's statement regarding Defendant's girlfriend—what it saw as a "valid threat to arrest" her.

■ Thus, we consider whether the record supports the trial court's ruling that Officer Schrimpf's statement rose to the level of coercion. The record demonstrates that, given the totality of the circumstances, Officer Schrimpf's statement was not coercive. Officer Schrimpf testified that he told Defendant, while urging him to tell the truth, that he "didn't want to see Claudia get drug into this thing if not actively involved," (R. at v. II, p. 27), and that "if Claudia didn't have involvement as she was saying, then it was important that he be honest and talk about what their actual involvement was." (R. at v. II, p. 37.) According to the testimony, Offi-

cer Schrimpf did not threaten to arrest Lechuga, nor did he imply to Defendant that he would arrest her if Defendant refused to testify. Rather, Officer Schrimpf simply urged Defendant to tell the truth. Officer Schrimpf testified:

> I told him it was important [to be truthful] because Claudia was saying she didn't have any knowledge or involvement in what was going on at the residence.... And it's important ... to be honest, because during the course of the investigation it's going to come out anyway. It's important he be honest and up front. He told me a lie when he originally started. He recanted that. I believe he made a statement that shows things don't look good. He needs to be honest and be consistent in what he knows and get it on the board.

(R. at v. II, p. 38–39.) Based on Defendant's spontaneous statement that "I know my uncle is in some bad shit" at the outset of the search, his later contradictory statement to Sergeant Black that he did not know anything, and information from Lechuga that Defendant was present during the drug transactions, Officer Schrimpf had reason to believe Defendant was lying. Thus, given the context in which the statement was made, it was not coercive for him to encourage Defendant to tell the truth.

In addressing a similar question, the Massachusetts Supreme Judicial Court held that a defendant's confession was not involuntary merely because a police officer told him, while being questioned, that his mother lied on his behalf and that she might also be culpable. *Commonwealth v. Raymond,* 424 Mass. 382, 676 N.E.2d 824, 827, 834 (1997). The court ruled, "While the police may not expressly bargain with the defendant over the release of other individuals or make threats of arresting and charging others with no basis, where this type of conduct is ab-

---

4. A person is in custody when he has been "subjected to the constraints associated with a formal arrest." *People v. Thomas,* 839 P.2d 1174, 1178 (Colo.1992). The test is objective: "whether a reasonable person in the suspect's position would consider himself deprived of his freedom of action in any significant way." *Thomas,* 839 P.2d at 1178. In this case, although Sergeant Black told Defendant he was not under arrest, Defendant was led out of his house at gunpoint, handcuffed, and surrounded by officers while

being interrogated. In addition, Officer Schrimpf testified that Defendant "wasn't free to leave." (R. at vol. II, p. 32.) Therefore, Defendant was "deprived of his freedom in a significant way" and was "in custody."

5. The record does not indicate Defendant's education level, employment record, or previous experience with law enforcement or the criminal justice system.

sent, the police may bring to the defendant's attention the possibility that his relatives may be culpable." *Id.* at 834 (internal citations omitted).

In this case, Officer Schrimpf, concerned about the conflicting statements by Defendant and his girlfriend, was attempting to uncover the truth. In doing so, he brought to Defendant's attention the possibility that his girlfriend might be involved. His statement about Lechuga must be read in context. The record demonstrates that Officer Schrimpf's reference to Lechuga was made while urging Defendant to tell the truth. Given this context, Officer Schrimpf's statement was not a threat to arrest Lechuga, but an attempt to ascertain the truth. Therefore, the trial court's ruling that Officer Schrimpf's statement was "tantamount to a valid threat to arrest a woman who he had no reason to believe was involved in any of these transactions" is not supported by the record.[6]

In examining whether a reproof regarding a defendant's truthfulness equals coercion, we have previously ruled that the mere fact that a polygraph examiner told a defendant that "in his opinion there had been some deception" by the defendant in his examination was not, considering the totality of the circumstances, enough to make his statement involuntary. *People v. Hutton,* 831 P.2d 486, 487, 489–90 (Colo.1992). In addition, courts in other jurisdictions have held that police encouragement to a defendant to tell the truth does not amount to coercion. *See, e.g., Amaya–Ruiz v. Stewart,* 121 F.3d 486, 494 (9th Cir.1997)(ruling, as a factor in the totality of circumstances, that encouraging Defendant to tell the truth did not amount to coercion); *United States v. Feyler,* 55 F.Supp.2d 55, 60 (D.Me.1999) (holding that "[a]dvising or admonishing a suspect to tell the truth during an investigatory interview does not constitute coercive law enforcement

conduct rendering a statement involuntary"); *State v. Loza,* 71 Ohio St.3d 61, 641 N.E.2d 1082, 1094 (1994) (rejecting Defendant's argument that police played on his feelings for his girlfriend and unborn child in order to coerce him to confess and ruling that "[a]dmonitions to tell the truth are considered to be neither threats nor promises and are permissible").

Accordingly, after reviewing the totality of the circumstances, we find that the record amply demonstrates that Defendant's will was not overborne by police and that Defendant made the statements voluntarily. Officer Schrimpf's statement about Lechuga, made in the context of urging Defendant to tell the truth and in light of prior inconsistent statements by Defendant and information indicating Defendant was lying, was not "tantamount to a valid threat to arrest a woman who he had no reason to believe was involved in any of these transactions" and did not amount to coercive conduct.

### III. Conclusion

In summary, we hold that the district court erred in finding that Defendant's statements on April 9, 2001 were involuntarily made. Therefore, we reverse the ruling of the district court and remand for further proceedings.

Justice MARTINEZ dissents and Justice BENDER joins in the dissent.

Justice MARTINEZ dissenting:

In this case, the majority concludes that "the record demonstrates that Defendant's statements were not the result of any force, threats, promises, or other forms of undue influence exerted by the police," maj. op. at 659, and thus reverses the trial court's suppression order. I disagree. My review of the record leads me to conclude that the trial court's findings of fact are inadequate to

---

**6.** This case is unlike *Medina* where we upheld the trial court's suppression order after finding support in the record for the court's findings of fact and conclusions of law. The trial court concluded that the interrogating detective's threat to have the defendant's child taken from both parents unless the defendant confessed to injuring the child played a significant role in inducing the defendant's confession. 25 P.3d at 1217. At trial, the defendant in *Medina* testified that police told him: "[I]f I didn't come in, they

were going to take [the child] from us. That that was the only way. My only option was to come in and speak to him." *Id.* at 1219. After hearing testimony from the detective, the social worker, family members, and the defendant, the trial court found that the detective "did in fact utilize a threat of taking the minor child from Defendant's family in order to elicit further cooperation from Defendant." *Id.* at 1223. We ruled that the trial court's findings were not clearly erroneous in light of the record.

**664**

reach any conclusion of law regarding the nature of Officer Schrimpf's remarks concerning the Defendant's girlfriend or the voluntariness of the Defendant's statements after his exchange with Officer Schrimpf. As explained below, the inadequacy of the trial court's factual findings resulted from the tentative and ambiguous nature of Officer Schrimpf's testimony. Because the trial court's findings are not likely to become more detailed, remand in this case would not be helpful. Thus, I would accept the record and the trial court's findings of fact as they currently stand and turn to the burden of proof in suppression cases to decide the case.

The People have the burden of proof, by a preponderance of the evidence, to demonstrate that the defendant's statements were voluntary. Because I find the record inadequate to reach any conclusion of law, I would thus affirm the trial court's suppression order on the ground that the People failed to meet its burden.

Although I agree with the majority that the trial court's holding is not supported by the record, I disagree with the majority's subsequent assertion that the record supports reversal of the trial court's suppression order because "the record demonstrates that, given the totality of the circumstances, Officer Schrimpf's statement was not coercive." Maj. op. at 662. Instead, my review of the record reveals that the testimony of Officer Schrimpf, which was the basis of the trial court's suppression order, alone is inadequate to support any decision on the issue of whether his statements to the Defendant were coercive or threatening.

Officer Schrimpf's testimony about his statements to the Defendant regarding the Defendant's girlfriend was general at best. He testified in a manner sufficiently vague as to raise a question about the specific content, tone, and nature of his conversation with the Defendant regarding the Defendant's girlfriend. For example, Officer Schrimpf testified: "At one point I confronted him, told him what Claudia told me. I told him it was important to be honest." R. vol. II at 24. At another point, Officer Schrimpf explained: "I don't believe I made him any promises. I believe I made a statement to the effect . . . I didn't want to see Claudia get drug into this thing if not actively involved. I made a

statement to that effect, but no way made any promises." R. vol. II at 27. Finally, the following exchange occurred between Officer Schrimpf and Defense counsel:

**Defense Counsel:** Now in your discussions with him, you obviously stressed it would be helpful if he would try to clear Claudia of any involvement; isn't that correct?

**Officer Schrimpf:** I believe what I said to him is, if Claudia didn't have any involvement as she was saying, then it was important that he be honest and talk about what their actual involvement was, yes.

R. vol. II at 37. Based on these statements, the trial court suppressed all of the statements made by the Defendant after he had the foregoing conversation with Officer Schrimpf. The trial court did not make extensive findings of fact, but instead simply stated that "Officer Schrimpf made this tantamount to a valid threat to arrest a woman who he had no reason to believe was involved in any of these transactions." R. vol. II at 47.

The majority relies on these same general, paraphrased statements from Officer Schrimpf to reach its conclusion of law that the Defendant was not coerced or threatened into giving inculpatory statements. Maj. op. at 662–663. The majority reasons that Officer Schrimpf had reason to believe that the Defendant was lying, so, given the context in which Officer Schrimpf's statements regarding the Defendant's girlfriend were made "it was not coercive for him to encourage Defendant to tell the truth." *Id.* at 662.

The majority, in essence, determines that the statements made by Office Schrimpf regarding the Defendant's girlfriend amount to nothing more than "encouraging Defendant to tell the truth." The trial court considered those same statements and determined that the statements amounted to a coercive threat. In my view, both the trial court and the majority reach a conclusion of law prematurely because of inadequate factual investigation and determination.

The majority correctly states that when the controlling facts are undisputed, the legal effect of those facts constitutes a question of law. Maj. op. at 661 (citing *People v. D.F.*, 933 P.2d 9, 15 (Colo.1997)). However, in my

view, the majority's assertion that "the controlling facts are undisputed," maj. op. at 661, does nothing to address the threshold issue of the adequacy of those allegedly undisputed facts. Whether the record below reveals no conflicting evidence regarding the details of the encounter between the Defendant and Officer Schrimpf is not the controlling issue in my mind. Rather, the determinative issue is the inadequacy of the factual record, which I consider sufficiently inadequate so as to render any conclusion of law improper.

Additionally, this case is distinguishable from *D.F.*, which the majority relies on to support its assessment of the factual findings in this case. In *D.F.*, we reversed the trial court's suppression order, concluding that the police officers had reasonable suspicion to stop the defendant. *D.F.*, 933 P.2d at 10. In *D.F.*, we accepted the findings of fact made by the trial court, but also determined that the trial court had inexplicably failed to incorporate one key, uncontradicted fact, which was present in the record, into its findings of fact. We thus included that fact in our consideration of the record and our decision to reverse the trial court's suppression order. That key fact was that the defendant was walking stiff-legged, indicating that he was carrying a concealed weapon, which was important support for the police officers' reasonable suspicion. *Id.* at 14. We found that it was proper for us as a reviewing court to consider that key fact, which went unconsidered by the trial court, in our review of the trial court's findings of fact and conclusions of law. *Id.* at 14–15. We thus concluded that when controlling facts are undisputed, including those controlling facts unconsidered by the trial court, the legal effect of those facts constitutes a question of law. *Id.* at 15 (citing *Lakeview Assoc., Ltd. v. Maes*, 907 P.2d 580 (Colo.1995)).

The present case presents a much different situation than the one in *D.F.* In this case, the trial court did not fail to consider a "key, uncontradicted fact" that was dispositive to the conclusion of law. On the contrary, the trial court in this case considered *all* of the relevant facts as presented in Officer Schrimpf's testimony. Thus, this case does not present an opportunity to employ the reasoning of *D.F.* because there is no

key, uncontested fact that the trial court failed to consider. The majority correctly states that where the trial court's findings of fact are clearly erroneous or not supported by the record, this court may set those factual findings aside. *See People v. Mendoza–Balderama*, 981 P.2d 150, 158 (Colo.1999). However, I am troubled by the majority's willingness to substitute its own fact finding for the trial court's fact finding in the face of such an inadequate record and in the absence of a *D.F.*-type situation in which the trial court merely neglects to consider a dispositive fact. In essence, the majority takes general and paraphrased statements by Officer Schrimpf, elevates these vague statements to hard, historical facts, and then proceeds to reframe the trial court's conclusion that the statements were a "threat" to its own conclusion that the statements were merely "encouragement" to tell the truth.

In addition, I disagree with the majority's expansion of the reasoning in *D.F.* to this case, which is importantly different from *D.F.* The majority's extension of *D.F.* to situations such as this, in which no key, uncontested fact was left unconsidered by the trial court, creates a problematic precedent permitting this court to substitute its own fact finding for that of the trial court.

Previously, we have held that when the trial court's findings of fact are inadequate to make any conclusions of law regarding suppression, remand is the appropriate course of action. *See, e.g., People v. Pitts*, 13 P.3d 1218, 1221 (Colo.2000); *People v. A.W.*, 982 P.2d 842, 852 (Colo.1999); *People v. Curtis*, 959 P.2d 434, 438 (Colo.1998); *People v. Trujillo*, 938 P.2d 117, 124–25 (Colo.1997).

Just as this case is distinguishable from *D.F.*, it is also distinguishable from the cases in which we remanded for further findings. As previously discussed, the testimony of Officer Schrimpf was vague and ambiguous. Thus, although we could remand for further findings, such a remand would be unlikely to result in more detailed findings because of the vague nature of Officer Schrimpf's testimony. Accordingly, I believe that remand here would more than likely be futile.

Because I believe that remand is inappropriate given the nature of this record, I view this case as a stalemate between the majority

and the trial court: Both consider the same inadequate facts and make differing findings of fact. The findings of the majority differ with those of the trial court because each make different inferences from the same vague testimony. Thus, the majority finds encouragement to tell the truth where the trial court finds implied coercive threats. Faced with this stalemate and the futility of remand, I would turn to the burden of proof to resolve this case.

The People bear the burden of demonstrating that the defendant's statements were voluntary by a preponderance of the evidence. *See People v. Valdez*, 969 P.2d 208, 210 (Colo.1998). The majority correctly explains this burden, but then fails to apply it to the inadequate record here. Because the record is inadequate upon which to base *any* conclusion of law, I would hold that the People failed to meet their burden of proof, and thus would affirm the trial court's suppression order.

Justice BENDER joins in the dissent.